In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2975

KENNETH HARPER,

*Plaintiff-Appellant*,

*v.*

C.R. ENGLAND, INCORPORATED,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:08-cv-00110-PRC—**Paul R. Cherry**, *Magistrate Judge*.

ARGUED FEBRUARY 10, 2012—DECIDED JUNE 8, 2012

Before RIPPLE and ROVNER, *Circuit Judges*, and COLEMAN, *District Judge*.[*]

RIPPLE, *Circuit Judge*. Kenneth Harper brought this action in Indiana state court against his former employer, C.R. England, Inc. ("C.R. England"), alleging racial discrimination, harassment and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights

---

[*] The Honorable Sharon Johnson Coleman of the Northern District of Illinois, sitting by designation.

Act of 1964, 42 U.S.C. § 2000e et seq. He also alleged that
C.R. England had retaliated against him for having filed a
workers' compensation claim, in violation of Indiana
law. C.R. England removed the case to the district court.[1]
The magistrate judge, sitting by consent of the parties,[2]
granted summary judgment in favor of C.R. England,
and Mr. Harper timely appealed.[3] He now asks that we
review the district court's determination only with
respect to his retaliation claim. After examining the
record, studying the appellate briefs and hearing the
argument of counsel, we conclude that the district court
correctly decided that there is no genuine issue of triable
fact on the retaliation claim and that the defendant there-
fore is entitled to judgment as a matter of law. Accord-
ingly, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

From July 2005 until his termination on August 3, 2007,
Mr. Harper, an African-American, was employed as a
driving instructor for C.R. England, a trucking corpora-

---

[1] *See* 28 U.S.C. § 1441(a). The district court had jurisdiction
over the federal claim under 28 U.S.C. §§ 1331 and 1343. It
had jurisdiction over the state claim under 28 U.S.C. § 1367(a).

[2] *See* 28 U.S.C. § 636(c).

[3] We have jurisdiction under 28 U.S.C. § 1291.

tion that operated a truck-driving school in Indiana. Mr. Harper was one of approximately twelve road instructors at the driving school. In that capacity, he did not provide any classroom instruction, but was assigned a group of students for road instruction in the operation of the trucks. He was expected to be present and available to his students during the weeks that they were assigned to him.

The road instructors' immediate supervisor held the title of "lead instructor" and reported to the director of the school, Chris Kelsey. In January 2007, the lead instructor left the company, and Director Kelsey appointed Mr. Harper, who had volunteered for the position, as acting lead instructor until the company was able to hire someone to fill the position on a permanent basis. In early 2007, Mr. Harper, along with about twenty other individuals, interviewed for the position of lead instructor, but he was not hired for the permanent position. The company instead selected Eric Metzler, also an African-American, because of his prior management experience in the trucking industry.[4]

---

[4] There is some confusion in the record with respect to the job title of the position that Mr. Harper was appointed to fill on a temporary basis. At his deposition, Mr. Harper explained that he was appointed to serve as "yard manager" and that the lead instructor position was a different position entirely. R.36-1 at 8 (Harper Dep. 23-24). Director Kelsey stated in his deposition that Mr. Harper was appointed to serve as interim lead

(continued...)

As part of the daily routine, Lead Instructor Metzler conducted morning meetings with his team of road instructors inside their office trailer.[5] Mr. Harper alleges that, on March 9, 2007, while the instructors were waiting for their meeting to start, another African-American instructor, Darnell Humphrey, called him a "mark ass n----r."[6] When Mr. Harper asked Humphrey what he had just said, Humphrey again called Mr. Harper a "n----r."[7] Mr. Harper admitted, in his deposition testimony, that Metzler was not in the room when Humphrey used the racial slur, but maintains that Metzler, who was in his adjacent office with the door open, heard Humphrey's comment. According to Mr. Harper, Metzler came in the room shortly after Humphrey called Mr. Harper a "n----r" for the second time and said "quit it" or "cut it out."[8] Metzler consistently has maintained that he was not in the room at the time of the alleged incident and that he did not hear Humphrey use any racial slur.

---

[4] (...continued)
instructor until Metzler was hired to fill the permanent position. R.36-4 at 4 (Kelsey Dep. 10). Metzler also stated that he was employed as lead instructor at C.R. England's truck-driving school. R.36-11 at 1 (Metzler Aff.).

[5] The road instructors operated out of a two-room trailer. One room was used as an employee lounge and conference area, and the other room served as Metzler's office.

[6] R.36-1 at 11 (Harper Dep. 37).

[7] *Id.* (Harper Dep. 38).

[8] *Id.* at 11, 14 (Harper Dep. 38, 47).

The day after the incident with Humphrey, a fellow C.R. England employee who had heard about the confrontation contacted Mr. Harper and recommended that he contact Carrie Johansen, Assistant Director of C.R. England's Human Resources Department, in Salt Lake City, Utah, about the incident and provided him with Johansen's contact information. Mr. Harper spoke briefly with Director Kelsey about his encounter with Humphrey shortly after the alleged incident took place.[9] Then, on April 18, 2007, Mr. Harper emailed Johansen and provided a formal statement regarding the March 9, 2007 incident. In his email, Mr. Harper wrote, "I have been angry, upset, hurt, stressed, and feel that I'm working in a hostile environment."[10]

After receiving Mr. Harper's email, Johansen contacted Director Kelsey and instructed him to contact Metzler to

---

[9] The record is not clear on this point. Mr. Harper stated in his April 18, 2007 email to Johansen that he originally spoke with Director Kelsey regarding the incident on March 16, 2007. In his deposition, Mr. Harper testified that he spoke with Director Kelsey regarding the incident "a few days" after it took place. *Id.* at 13 (Harper Dep. 44). He explained that he met with Director Kelsey and Metzler in Director Kesley's office and Metzler denied hearing Humphrey's use of the racial slur. *Id.* (Harper Dep. 45-46). Director Kelsey testified that he was unaware of the incident until Johansen contacted him in late April, after receiving Mr. Harper's email. R.36-4 at 6 (Kelsey Dep. 16-17).

[10] R.36-2 at 4.

"find out what had happened."[11] According to Director Kelsey, Metzler interviewed every individual that Mr. Harper had said was in the room at the time of the exchange between Mr. Harper and Humphrey.[12] Metzler then reported to Director Kelsey that he was unable to determine what, if anything, Humphrey had said to Mr. Harper.[13] When Director Kelsey met with Metzler, he made clear that, if the incident did happen, it had better not happen again because such a remark would warrant discharge.[14] He also instructed Metzler to give the same warning to Humphrey. Director Kelsey reported to Johansen that he had handled the situation.

Mr. Harper met with Director Kelsey a second time to discuss the Humphrey incident. Director Kelsey asked Mr. Harper how they could "move past th[e] incident," and what the company could do to make the work environment more comfortable for him.[15] Director Kelsey offered Mr. Harper several options, including time off and a transfer to another position within the company.

---

[11] R.36-4 at 6 (Kelsey Dep. 18). In his April 18 email to Johansen, Mr. Harper recounted a meeting with Director Kelsey and Metzler, during which Director Kelsey instructed Metzler to "handle" the situation. R.36-2 at 4.

[12] R.36-4 at 9 (Kelsey Dep. 29).

[13] *Id.* Mr. Harper disputes that any investigation into the incident took place. R.36-1 at 14 (Harper Dep. 47).

[14] Metzler was not called for a deposition and is no longer an employee of C.R. England.

[15] R.36-1 at 14 (Harper Dep. 48).

Mr. Harper also met separately with Metzler to discuss, among other things, the email he had sent to human resources. He claims that Metzler questioned his reasons for sending the email and wanted to know what he expected would come as a result of it. In addition, Metzler said that Mr. Harper's "skin should not be so thin."[16]

Mr. Harper further alleged that, on approximately four or five occasions after March 9, 2007, he heard other instructors use the slur "n----r" in workplace conversations. However, in his deposition, Mr. Harper testified that these remarks were not directed at him and that Metzler was not part of the conversations.[17] Mr. Harper was not able to provide the names of the instructors who used the term.

Mr. Harper also informed Director Kelsey that the word "asshole" had been written on his time card on one occasion at some point after March 9, 2007.[18] Director Kelsey assured Mr. Harper that he would talk to Metzler about it. Metzler responded to the incident by moving the time clock and time cards inside his office.[19]

On June 24, 2007, Mr. Harper contacted Metzler to tell him that he would not be able to report to work on Monday, June 25, due to illness. Metzler left Mr. Harper

---

[16] *Id.* at 16 (Harper Dep. 56); *see also* R.36-2 at 5.

[17] R.36-1 at 16 (Harper Dep. 57).

[18] *Id.* at 19 (Harper Dep. 70).

[19] *Id.* at 20 (Harper Dep. 71-72).

a message telling him that he would have to assign his truck group to another instructor and directed him to stay at home for the rest of the week.

On Thursday of that same week, Metzler informed Mr. Harper that he needed to meet with him the following day, Friday, June 29, 2007. During their Friday meeting, Metzler administered three written warnings to Mr. Harper, the most serious being for poor attendance. Metzler told Mr. Harper that he was being placed on probation for taking too much time off and warned him not to take any more days off or leave work early for the remainder of the year. Mr. Harper understood that, pursuant to C.R. England policies, he could be terminated if his attendance did not improve.[20] Prior to this date, Metzler had given Mr. Harper permission to leave work early on Fridays to pick his son up from school. Metzler previously had told Mr. Harper that "he had

---

[20] *Id.* at 18 (Harper Dep. 63-64). The C.R. England policies and procedures booklet states, in pertinent part:

> In harmony with the company's at-will status, C.R. England reserves the right to discipline an employee up to and including discharge for infractions of work rules or any policies or conditions of employment with the company. Discipline may include, but is never guaranteed to include, verbal or written warnings prior to discharge.

R.36-3 at 7. "Excessive absence" and "[p]oor job performance" are among those matters listed that might result in an employee's suspension and/or termination. *Id.*

no problem with it."[21] Yet, Metzler now made clear to Mr. Harper that those kinds of early departures would no longer be permitted because they had "exceeded acceptable levels" and because Mr. Harper's "absence ha[d] now begun to affect [his] performance at work."[22]

In addition to the written warning for poor attendance, Metzler also gave Mr. Harper a warning for failing to report his mileage at the close of business on Friday on four occasions and for not turning in the key to his assigned truck. Metzler gave Mr. Harper a third written warning for the poor rates of hire for students that he had been assigned ("start-to-hire rate").[23]

Mr. Harper spoke with Director Kelsey regarding Metzler's direction to take the week of June 25 off after he had called in sick on Monday. Director Kelsey, after evaluating the circumstances surrounding Metzler's decision, and Mr. Harper's recent attendance record, ultimately agreed with Metzler's decision.

---

[21] R.36-1 at 18 (Harper Dep. 63).

[22] R.36-6 at 19.

[23] Although Metzler administered three written warnings to Mr. Harper on June 29, Mr. Harper was fired due to poor attendance. There is no evidence in the record to indicate that Mr. Harper was fired for failing to report his mileage, failing to turn in his key or poor start-to-hire rates. Mr. Harper himself verified at his deposition that Director Kelsey had told him he was being terminated because of absenteeism. R.36-1 at 26 (Harper Dep. 97).

After he was placed on probation, Mr. Harper took several days off to attend his sister's wedding and an additional day off for a court appearance.[24] On July 10, 2007, he emailed Johansen and asserted, among other things, that he believed that the written warnings were unwarranted and requested further clarification on C.R. England's policies "regarding attendance, employee conduct, and harassment in the workplace."[25] He also recounted portions of his conversation with Metzler, stating that Metzler had implied that his "skin shouldn't be so thin" and that Mr. Harper "should move on and get over it, because [Metzler] grew up in the 60s and he was called (N----R) many times."[26] The email also set forth a number of complaints about the treatment Mr. Harper had received from his coworkers and, in particular, from his supervisor, Metzler, after the original email to human resources.

On or about July 13, 2007, Mr. Harper initiated a "First Report of Injury or Illness," prepared by the Man-

---

[24] Mr. Harper contends that he had informed Metzler that he needed to take some days off to attend his sister's July wedding. He maintains that Metzler told him in advance that he could have the days off. The record makes clear that, following Mr. Harper's being placed on probation, Metzler told him that he could only take the time off if he had leave available. The parties dispute whether Mr. Harper had any leave available in July 2007.

[25] R.36-2 at 5.

[26] *Id.*

ager of Workers' Compensation, Darlene Niebuhr, in which he stated that, beginning at the end of March 2007, his health had started to decline. He specifically referred to experiencing headaches and high blood pressure, which he believed were related to harassment in the workplace. Mr. Harper never filed a workers' compensation claim.

On July 31, 2007, Mr. Harper again spoke with Johansen on the telephone and reiterated his concerns about the way that he was being treated by Metzler.

Shortly thereafter, Mr. Harper was terminated. Before reaching the final decision to terminate Mr. Harper, Director Kelsey consulted with Johansen about Mr. Harper's attendance records. Johansen verified that Mr. Harper had exceeded his leave and agreed with Director Kelsey's decision to terminate Mr. Harper.[27]

---

[27] R.36-5 at 11 (Johansen Dep. 36-38). Johansen testified at her deposition that, in her opinion, the number of days that Mr. Harper had missed, whether approved or not, "seemed excessive." *Id.* (Johansen Dep. 36). She explained that the number of absences becomes excessive "[w]hen it impacts [an employee's] performance," and that would "depend on [the employee's] job." *Id.* (Johansen Dep. 37). Johansen verified that C.R. England does not have a rule that governs absences or leaving early, and that it is left to the discretion of the supervisor to decide on a case-by-case basis. She explained that the determination as to when the number of absences or early departures is affecting an employee's job performance is ultimately the responsibility of the employee's supervisor.

(continued...)

On August 3, 2007, Director Kelsey met with Mr. Harper and told him he was being terminated for poor attendance.[28] Director Kelsey prepared a written Termination Evaluation Form that indicated as the explanation of termination that Mr. Harper "ha[d] not been able to do [his] job full time."[29] At the time of his termination, Mr. Harper had missed seventeen days since January 1, 2007. Although the record is not clear with respect to the nature of these absences, this total includes four sick days, two holidays and at least seven vacation days prior to his probation. It also includes three additional days after his probation: two for his sister's wedding and one to appear in court.[30]

---

[27] (...continued)

Johansen verified that, in Mr. Harper's case, this decision would be left to the discretion of "Mr. Metzler in conjunction with Mr. Kelsey." *Id.* Although Mr. Harper provides an alternate interpretation of Johansen's statements with respect to the decision to terminate him, we believe that, reading the testimony in total, it is clear that the decision to terminate Mr. Harper was not made by Metzler, but by Director Kelsey with the concurrence of Johansen.

[28] Metzler stated that Director Kelsey made the decision to terminate Mr. Harper based on poor attendance. He also noted that Director Kelsey did not consult him regarding the decision to terminate Mr. Harper. R.36-11 at 3 (Metzler Aff.).

[29] R.36-6 at 63.

[30] *See* R.36-6 at 22.

**B. Procedural History**

Following the termination of his employment, Mr. Harper filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") against C.R. England. He alleged that he had been terminated unlawfully in retaliation for complaining of racial discrimination and a hostile work environment. On March 6, 2008, after receiving a "right to sue letter" from the EEOC, Mr. Harper filed a complaint in the Porter County Superior Court, alleging racial discrimination, harassment and retaliation under 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e et seq. He also alleged retaliation for filing a workers' compensation claim in violation of Indiana law. C.R. England removed the case to the United States District Court for the Northern District of Indiana under 28 U.S.C. § 1441(a), and, once removal was effected, moved for summary judgment.

With respect to Mr. Harper's retaliation claim, the district court concluded that Mr. Harper had failed to set forth a prima facie case, under either the direct or indirect method of proof, to support his claim that C.R. England had retaliated against him for reporting what he believed to be unlawful racial discrimination. The district court ultimately granted summary judgment for the defendant on all five counts set forth in Mr. Harper's complaint. Mr. Harper now appeals only the district court's decision to grant summary judgment with respect to his retaliation claim.

## II

## DISCUSSION

### A. Standard of Review

We review the district court's decision to grant a motion for summary judgment de novo, construing all the facts in the light most favorable to the nonmoving party, Mr. Harper. *See Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "However, our favor toward the nonmoving party does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (alteration in original) (internal quotation marks omitted). Rather, "[a] genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008) (internal quotation marks omitted).

### B. Direct Method of Proof

A plaintiff may establish retaliation under either the direct or indirect method of proof. *See Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). To establish retaliation under the direct method, a plaintiff must present evidence, direct or circumstantial, showing that: (1) he engaged in a statutorily protected activity;

(2) he suffered a materially adverse action; and (3) a causal connection exists between the two. *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006).

Here, it is undisputed that Mr. Harper's complaint of racial discrimination and harassment is a statutorily protected activity. The parties also correctly agree that Mr. Harper's termination constitutes an adverse employment action. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (stating that an employee's termination "certainly qualifies as an adverse employment action").[31]

---

[31] On appeal, Mr. Harper does not challenge the district court's conclusion that ostracism by his coworkers and comments made by his direct supervisor, Metzler, did not amount to an adverse employment action within the meaning of Title VII. However, Mr. Harper does challenge the court's additional determination that the three written warnings administered to Mr. Harper in June 2007 by Metzler, which resulted in Mr. Harper's being placed on probation, did not amount to an adverse employment action. Indeed, we have suggested that placing an employee on probation, in some cases, may constitute a materially adverse employment action, *see Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996), but we do not believe that is the case here.

The Supreme Court has construed Title VII's anti-retaliation provision broadly. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). Indeed, a materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted);

(continued...)

---

[31] (...continued)
*Lewis v. City of Chi.*, 496 F.3d 645, 655 (7th Cir. 2007). In other words, "if the challenged action would discourage other employees from complaining about employer conduct that violates Title VII, it constitutes an adverse employment action." *Vance v. Ball State Univ.*, 646 F.3d 461, 473 (7th Cir. 2011).

We believe that, given the circumstances surrounding the employer's actions in this case, the district court correctly concluded that the written warnings and the placement of Mr. Harper on probationary status did not rise to the level of a materially adverse employment action. Mr. Harper made his complaint, at the very latest, on April 18, 2007, more than two months before he was given the warnings and placed on probation the week of June 25, 2007. We further note that Mr. Harper was placed on probation only after calling in sick on June 25, which resulted in his group being reassigned to another instructor. We therefore do not believe that a reasonable employee would be discouraged from filing a Title VII complaint as a result of the actions taken against Mr. Harper.

Furthermore, even if we were to conclude that the warnings constitute a materially adverse employment action, Mr. Harper would be unable to show a connection between his complaint, which he made, at the very latest on April 18, 2007, and the administration of the warnings, which occurred more than two months later, during the week of June 25, 2007. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (holding that a seven-week interval between a sexual harassment complaint and plaintiff's termination "does not represent that rare case where suspicious timing, without more, will carry the day"); *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (holding that timing was not enough, on its

(continued...)

On appeal, Mr. Harper challenges the district court's conclusion that his claim under the direct method failed because he was unable to establish the third prong of the analysis: that a causal connection exists between his complaints to Director Kelsey and Johansen and his subsequent termination.

Under the direct method of proof, Mr. Harper can rely on either direct or circumstantial evidence to show that C.R. England was motivated to terminate him because of his protected activity. *See Haywood*, 323 F.3d at 529. Evidence of retaliation is direct when, "if believed by the trier of fact, [it] will prove the particular fact in question without reliance on inference or presumption." *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999) (internal quotation marks omitted). "Because direct evidence . . . essentially requires an admission by the employer," such evidence "is rare." *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008). Mr. Harper has not produced any direct evidence of a causal link between his complaints of racial discrimination and his subsequent termination. He instead relies upon what he considers to be "a convincing mosaic of circumstantial

---

[31] (...continued)
own, to create a jury issue on retaliation where the plaintiff had threatened to file an EEOC complaint three months and then again six weeks before she was fired); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998) (affirming summary judgment in favor of the employer where the employee complained of sexual harassment in August and was laid off in November of the same year).

evidence," *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (internal quotation marks omitted), that would permit a jury to infer unlawful retaliation on the part of his employer, C.R. England. In the past, we have held that circumstantial evidence of retaliation may include "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).[32]

Mr. Harper's primary argument with respect to his presentation of circumstantial evidence is based on the proximity between his complaints to human resources and his termination. It is well established that "mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.

---

[32] This court frequently has recognized two additional categories of circumstantial evidence, which traditionally have been associated with the indirect, rather than the direct method of proof: (1) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and (2) "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (internal quotation marks and citations omitted); *see* discussion *infra* pp. 31-33.

2002); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation . . . ."). However, "together with other facts, [suspicious timing] can sometimes raise an inference of a causal connection." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008).

Here, as is the often the case, "[w]e can measure the time in several ways." *Id.* The district court concluded that, "[w]ithout any other evidence supporting a link between the two occurrences, the several-month time lag between [Mr. Harper's] complaint of racial harassment to his supervisor in March, 2007, or even the later complaint to human resources on April 18, 2007, and his August 3, 2007, termination is too great to support an inference of retaliation."[33] The district court also rejected Mr. Harper's contention that the proper time period for the court to consider was the much closer proximity between his contact with Johansen in human resources via email on July 10, 2007, and via telephone on July 31, 2007, and his termination on August 3, 2007. Mr. Harper now renews this latter argument before us. He also contends that his case may be distinguished from the cases considered by the district court because he has presented additional circumstantial evidence, other than suspicious timing, to support an inference of retaliation.

Even if we were to accept Mr. Harper's contention that we should consider the proximity between his

---

[33] R.44 at 15.

contact with Johansen on several occasions in July and his termination in early August, we agree with the district court that Mr. Harper has not met his burden of putting forth other evidence that suggests that his protected activities were in any way linked to his termination. In addition to the evidence of suspicious timing, Mr. Harper offers the following circumstantial evidence: (1) Director Kelsey and Metzler did not conduct a proper investigation into Humphrey's alleged derogatory comments; (2) Metzler met with Mr. Harper after the investigation was complete and asked him what he hoped to gain by filing a complaint with human resources; and (3) Metzler told him that he needed to grow a thicker skin.

Mr. Harper provides no support for his assertion that Metzler and Director Kelsey did not conduct a proper investigation into the alleged incident. The only related argument that Mr. Harper made is that Director Kelsey and Metzler attempted to cover up Mr. Harper's complaint, but he does not dispute that Metzler and Director Kelsey made clear to all of the road instructors that the use of racial slurs would constitute a firing offense. Such action on the part of management certainly does not indicate that it was engaged in a cover up. Mr. Harper also does not dispute that, shortly after he complained to Director Kelsey that "asshole" had been written on his time card, Metzler moved the time cards inside his office to avoid any further incidents in the future. Finally, he does not dispute that Director Kelsey reported all information regarding the investigation and handling of Mr. Harper to human resources

and that human resources did not ask for any further action.

Mr. Harper is correct in asserting that Metzler's comments in the aftermath of the investigation constitute some circumstantial evidence of retaliation. However, the record makes clear that Director Kelsey, and not Metzler, made the decision to fire Mr. Harper. Further, there is no evidence in the record to suggest that Director Kelsey's decision to fire Mr. Harper was in any way influenced by Metzler. *See Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (explaining that, under the "cat's paw" theory of liability, an employer may be held liable if "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive"). Rather, the evidence suggests that Director Kelsey made the decision to terminate Mr. Harper only after he had discussed the situation with Johansen. Therefore, Metzler's comments do not help to establish a link between Mr. Harper's complaint and the termination of his employment in August 2007.

Because evidence regarding suspicious timing, without more, is generally insufficient to support a reasonable inference of retaliation, we conclude that Mr. Harper has failed to establish a prima facie case of retaliation under the direct method of proof.

**C.  The Indirect Method of Proof**

Under the indirect, burden-shifting approach, Mr. Harper may establish a prima facie case of retaliation by showing that: (1) he engaged in a statutorily protected activity; (2) he met his employer's legitimate expectations, i.e., he was performing his job satisfactorily; (3) he suffered a materially adverse action; and (4) he was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Once a plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory reason for discharging the plaintiff. *Id.* If the defendant meets its burden, the burden shifts back to the plaintiff to show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual. *Id.*

As we already have noted, it is not disputed that Mr. Harper engaged in a statutorily protected activity or that he suffered an adverse employment action. However, Mr. Harper challenges the district court's findings with respect to (1) whether he was meeting the legitimate expectations of C.R. England at the time of his termination, and (2) whether similarly situated employees who did not engage in the statutorily protected activity were treated more favorably.

We agree, for the reasons that follow, with the district court's conclusion that Mr. Harper has not presented sufficient evidence to satisfy either requirement and,

therefore, has failed to make a prima facie case for re-taliation under the indirect method.

### 1. Similarly Situated Individuals

We first turn to Mr. Harper's argument that he was treated less favorably than other instructors who, he claims, were similarly situated. A similarly situated employee need not be in a situation identical to that of the plaintiff. Nevertheless, a plaintiff must show not only that the proffered comparators "dealt with the same supervisor[ and] were subject to the same standards," but also that they "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks omitted); *see also Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (holding that a similarly situated employee is one who is "comparable to the plaintiff in all *material* respects" (emphasis in original)). In short, being "similarly situated" requires "enough common features between the individuals to allow [for] a meaningful comparison." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

We agree with the district court's conclusion that Mr. Harper has failed to identify any other C.R. England instructor who had a comparable attendance record. Mr. Harper provides the name of only one individual, Kim Beckom, who he asserts received more favorable treatment with respect to attendance issues. However,

as the district court pointed out, the documents provided by Mr. Harper do not include Beckom's attendance records or indicate how much work Beckom missed before he was discharged in May 2006 due to his inability to work the required schedule. Here, we believe that a meaningful comparison only may be made by identifying those employees who received more favorable treatment while on probation for attendance issues. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 786 (7th Cir. 2007) (requiring plaintiffs to identify an employee who had engaged in similar misconduct in order to satisfy the similarly situated requirement); *see also Argyropoulos*, 539 F.3d at 735 (same). We therefore agree with the district court's conclusion that, with respect to Beckom, Mr. Harper failed to demonstrate that he "was a similarly situated employee suitable for comparison."[34]

In addition, Mr. Harper provides a list of names and asserts generally that "eight of the nine witnesses identified by Harper, who did not complain of or confirm use of racial slurs by Darnell Humphrey—were treated more favorably than Harper." Appellant's Br. 24. However, Mr. Harper fails to point to any listed individual who was treated more favorably with respect to his or her attendance record. His contention that "[C.R.] England produced no evidence that any employee other than Harper had [h]olidays and vacation used against him to create a history of attendance issues for which the

---

[34] R.44 at 20.

employee was fired," Appellant's Br. 23, is hardly suffi-
cient to satisfy this requirement.

Because Mr. Harper has not demonstrated that any of
the coworkers listed had a "comparable set of failings,"
*Haywood*, 323 F.3d at 530 (applying the standard in
the discrimination context), he fails to establish that any
of these individuals were similarly situated for the pur-
poses of establishing a retaliation claim.

### 2. Work Performance and Employer's Legitimate Expectations

Next, we turn to Mr. Harper's contention that he
was performing his job satisfactorily at the time of his
termination. In order to determine whether Mr. Harper
was meeting his employer's legitimate expectations,
"[t]he proper inquiry mandates looking at [Mr. Harper's]
job performance through the eyes of [his] supervisors at
the time of [his] . . . termination." *Gates*, 513 F.3d at
689. Although Mr. Harper fails to develop fully this
argument, he seems to suggest that the alleged disparities
in C.R. England's treatment of its employees with
respect to job performance standards, in addition to
the fact that he was appointed to act as interim lead
instructor from January 2007 to February 2007, serves as
evidence that he was meeting C.R. England's legitimate
job expectations.

As we discussed earlier, Mr. Harper failed to identify
any other instructor who had a comparable attendance
record, and his argument with respect to the disparities

in C.R. England's treatment of its employees is therefore unsupported by the record. In addition, it is important to note that, *at the time of his termination*, Mr. Harper was on probation for attendance issues. In his deposition, Mr. Harper testified that he was aware of C.R. England's expectations that the instructors be on time and present for their students. He admitted that he had been aware that he was placed on probation for attendance reasons and acknowledged that he had known that he could be terminated if he continued to take time off of work after being on probation. It is also undisputed that, after being placed on probation, Mr. Harper took several days off to attend his sister's wedding and one additional day to appear in court. Although the parties dispute whether Mr. Harper indeed had exceeded his number of authorized leave days and whether certain of these days off had been authorized, C.R. England's policies and procedures booklet makes clear that "[v]acation time requests are subject to [m]anagement approval based upon operating requirements, staffing consider-ations, and business necessity."[35] Furthermore, Mr. Harper does not proffer any evidence to rebut C.R. England's criticism of his job performance, nor does he argue that the cumulative effect of his absences did not in fact inter-fere with his job performance. We therefore conclude that Mr. Harper has not shown that he was performing his job adequately at the time of his termination.

---

[35] R.36-3 at 10.

### 3. Pretext

Because Mr. Harper has failed to make out a prima facie case of retaliation under the indirect method, we need not address the issue of pretext. *See Volovsek v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 692 (7th Cir. 2003). Nonetheless, in the interest of completeness, we shall address Mr. Harper's arguments with respect to this issue.

C.R. England has offered a legitimate, nondiscriminatory reason for terminating Mr. Harper: excessive absences. In determining whether an employer's stated reason is pretextual, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005). In short, to meet this burden, Mr. Harper "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in C.R. England's stated reason "that a reasonable person could find [it] unworthy of credence." *Boumehdi*, 489 F.3d at 792 (applying this standard in the discrimination context).

To begin, we address Mr. Harper's argument that C.R. England was inconsistent in its reasoning for terminating him and that this inconsistency provides

additional evidence of pretext. Mr. Harper's characterization of the record with respect to the reasoning behind his termination is inaccurate. Mr. Harper's Termination Evaluation Form states that he was being fired because he "ha[d] not been able to do [his] job full time."[36] Although the form indicates that Mr. Harper had received warnings in the past regarding absenteeism and poor performance, nothing on the form indicates that he was fired for any other reason than violating the terms of his attendance probation. Furthermore, in his deposition, Mr. Harper testified that Director Kelsey told him on August 3, 2007, that the reason he was terminating his employment was because of absenteeism.[37] Mr. Harper further agreed that he did not know of any evidence suggesting that he was being terminated for some other reason.[38] Similarly, Director Kesley testified at his deposition that he made the decision to fire Mr. Harper because of "[m]ultiple attendance issues."[39] It is clear from the record that, although Director Kelsey looked at all three of Mr. Harper's written warnings, he relied upon Mr. Harper's probation violation in concluding that his employment should be terminated. Mr. Harper's argument that C.R. England shifted its reason for terminating his employment is therefore unsupported by the record, including his own testi-

---

[36] R.36-6 at 63.

[37] R.36-1 at 20, 26 (Harper Dep. 74, 97).

[38] *See id.* at 26 (Harper Dep. 97).

[39] R.36-4 at 13 (Kelsey Dep. 45).

mony regarding C.R. England's explanation for his termination.

Mr. Harper also submits the following as evidence of pretext: (1) he was disciplined for mileage and keys when C.R. England had no policy concerning either; (2) C.R. England changed the start-to-hire rate, and Metzler did not discipline any other instructor for being below the acceptable level; (3) C.R. England counted paid holidays and vacation days against Mr. Harper, but not against any other employee; (4) he was not permitted to take days off for his sister's wedding when the leave already had been approved prior to his being placed on probation; (5) C.R. England tried to cover up the Humphrey incident; and (6) he was given written warnings after voicing complaints and then fired after complaining about being singled out for unjust discipline. We consider each of these arguments, in turn, bearing in mind that the burden is on Mr. Harper to establish that C.R. England's proffered reason for his termination is pretextual.

As we explained earlier, we need not address Mr. Harper's arguments with respect to his being disciplined for failing to report mileage or to turn in his keys, nor must we address Mr. Harper's arguments with respect to the company's start-to-hire rates; neither argument is germane to our discussion of whether C.R. England's stated reason for firing Mr. Harper, i.e., excessive absences, was pretextual. We therefore turn to Mr. Harper's argument that the evidence shows that C.R. England improperly counted paid holidays and vacation

days against Mr. Harper as excessive leave. As we already have noted, an issue of fact clearly exists as to whether Mr. Harper had exceeded his authorized number of leave days and whether C.R. England impermissibly counted paid holidays and vacation days against him. One also can debate whether it is good policy to include paid leave or vacation days in evaluating an employee's total attendance record or whether certain of Mr. Harper's days off during 2007 indeed were authorized by Mr. Harper's supervisors. The fact remains, however, that C.R. England fired Mr. Harper because it found that his cumulative exercise of leave was excessive and that it was affecting his performance as an instructor.

We need only briefly reiterate that Mr. Harper provides no evidence to support his assertion that Director Kelsey and Metzler tried to cover up the incident with Humphrey. As we have discussed earlier, Mr. Harper does not dispute that, in the aftermath of the alleged incident, Metzler, at the direction of Director Kelsey, warned the road instructors, including Humphrey, that the use of racial slurs would not be tolerated. In addition, Mr. Harper is unable to provide evidence to support his claim that Metzler interviewed only two of the nine witnesses to the incident. According to Director Kelsey, Metzler confirmed that one instructor, Richard Ramos, verified Mr. Harper's account of the confrontation with Humphrey. However, Metzler also reported that Humphrey denied using the racial slur and at least one other instructor, whom Mr. Harper identified as being present at the time of the incident, did

not hear Humphrey call Mr. Harper a "n----r." Director Kelsey reported the results of Metzler's investigation to Johansen in human resources, and she did not ask for any further action. There is therefore no evidence that Director Kelsey or Metzler in any way covered up the incident.

Finally, Mr. Harper returns to his argument regarding the timing of his complaints. He argues that the proximity between his complaints to human resources regarding the written warnings and other unfair discipline he received from Metzler via email on July 10, 2007, and by telephone around July 31, 2007, and his subsequent termination on August 3, 2007, amounts to evidence of pretext. As we have discussed above, evidence of suspicious timing, without more, is insufficient to support a claim of retaliation.

In short, Mr. Harper makes a number of assertions, none of which could lead a reasonable jury to conclude that C.R. England's stated reason for firing him was pretextual. Rather, as the district court aptly noted, Mr. Harper argues that his termination was unfair, but he does not provide any evidence to refute C.R. England's position that his cumulative exercise of leave was excessive or to demonstrate that his absences did not affect his job performance and ability to instruct. We therefore conclude, in the alternative, that Mr. Harper has failed to demonstrate that C.R. England's stated reason for terminating him is pretextual.

Finally, we note that under Judge Wood's approach in *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (Wood,

J., concurring), the same result obtains. In *Coleman*, our colleague, joined by the other judges on the panel, suggested in a special concurring opinion that our familiarity with these kinds of discrimination and retaliation cases has evolved to the point where two distinct methodologies, rather than clarifying or simplifying our analysis of a particular case, has become a complicating factor. Judge Wood suggested that we would be better served at this time by "collaps[ing] all these tests," into a single, unified approach that distills the core issue at the heart of these cases: whether "a rational jury could conclude that the employer took that adverse action on account of [the employee's] protected class [or activity], not for any non-invidious reason." *Id.* at 863 (Wood, J., concurring); *see also King v. Acosta Sales & Mktg., Inc.*, No. 11-3617, 2012 WL 807199, at *3 (7th Cir. Mar. 13, 2012) (discussing briefly Judge Wood's concurring opinion in *Coleman*).

Certainly, cases such as this one demonstrate that the line between circumstantial evidence under the direct method and indirect evidence of discrimination or retaliation under the burden-shifting approach has been blurred by the gradual integration of these methodologies. Furthermore, we believe that a streamlined evaluation of the evidence presented, including the timing of Mr. Harper's termination, his job performance and ratings after he complained to Director Kelsey and Johansen, his attendance record compared to those of his coworkers, as well as C.R. England's proffered reason for termination, would yield the same conclusion, without the "snarls and knots," *Coleman*, 667 F.3d at 863

(Wood, J., concurring), created by the broad, and now overlapping, approaches. The circumstantial evidence in the record, construed in the light most favorable to Mr. Harper, simply does not constitute a sufficient basis for sustaining a jury verdict in his favor.


## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED