In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3617

SUSAN A. KING,

*Plaintiff-Appellant*,

*v.*

ACOSTA SALES AND MARKETING, INC., *et al*.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 456—**Robert W. Gettleman**, *Judge*.

ARGUED FEBRUARY 13, 2012—DECIDED MARCH 13, 2012

Before EASTERBROOK, *Chief Judge*, and POSNER and WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Acosta Sales and Marketing is a food broker, which represents producers that seek to sell to supermarkets and other bulk purchasers. In 2001 Acosta's midwest operation hired Susan King as one of its business managers—a term that Acosta uses for people who represent a group of producers. (McCormick & Co., which sells spices and spiced foods,

was one of King's major clients.) After quitting in 2007, King charged Acosta with two kinds of sex discrimination: that Acosta maintained a hostile work environment in which conditions for women were inferior to those for men, and that Acosta paid women less than men for the same work. Both kinds of discrimination violate Title VII of the Civil Rights Act of 1964, and discrimination in pay also violates the Equal Pay Act, 29 U.S.C. §206(d). King advanced some other claims in the district court but does not pursue them on appeal. King also sued four of Acosta's corporate affiliates; the only one that matters is her employer. See *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 771 (7th Cir. 2007). We disregard the rest.

The district court granted summary judgment to Acosta on King's claims under federal law. 2011 U.S. Dist. LEXIS 13958 (N.D. Ill. Feb. 10, 2011). Although the order did not mention her claim under state law, and the decision therefore was not final, King immediately appealed. Last fall we dismissed that appeal for lack of jurisdiction. No. 11-1876 (7th Cir. Oct. 21, 2011). The parties returned to the district court, which wrapped up the suit. King has abandoned the state-law claim, so when she filed a new appeal we allowed the parties to proceed on their original briefs. It is at last ready for appellate decision.

King contends that the work environment at Acosta was hostile to her throughout her employment. The district judge broke that contention into two, asking first whether working conditions were actionable during the 300 days before King filed her charge with the EEOC

(the judge gave a negative answer) and then whether acts that preceded the 300-day window could be attributed to the employer. That approach misapplied *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), which holds that an employee may rest a hostile-working-environment claim on acts any time during her employment. *Morgan* concludes that, when an assertedly unlawful employment practice occurs as a pattern over time rather than in one discrete act, it does not matter when the individual deeds contributing to the pattern occurred, if the pattern continued into the 300 days before the charge's filing.

The district court's error does not require a remand, however, because King's evidence does not establish a pattern of hostility that continued into the 300 days before her charge. Most of the obnoxious acts were committed by Thomas Connelly, another of Acosta's business managers, between 2001 and 2004. Connelly distributed pornographic materials at work and in February 2002 showed King a picture of himself wearing only a trench coat, tight swimming trunks, and a dildo. Three months later Connelly gave King a pornographic video tape and a nine-inch dildo. In September 2004 he called her a "cunt" during a business meeting. King promptly complained to her supervisor. Connelly was disciplined and instructed to clean up his act; he did not harass King again before quitting in 2005, approximately two years before King filed her charge with the EEOC.

King's working environment was markedly better after September 2004. There were still events that King

found unwelcome. One supervisor made a pass at her; another called her "Suzie Big Hair" and referred to one of King's co-workers as a "tramp" and another as "Pass-Around Patti." When a representative of one of Acosta's clients made a crude sexual remark, King's supervisor let the incident pass. All of this may have been unpleasant, but none of it was severe, and a few incidents at the rate of one every four to six months (which is what King's evidence shows) cannot be called pervasive. "The prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment. 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.' [*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).] We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). Once Connelly desisted, King's working environment was not marked by severe or pervasive hostility toward women. (We need not decide whether Connelly's behavior, which long predated the period of limitations, would satisfy the Supreme Court's hostile-working-conditions doctrine.)

Pay is a different matter. Even a dollar's difference based on sex violates both Title VII and the Equal Pay

Act—and King established much larger differences. Some men in the same job classification, doing the same work under the same conditions, received more than twice her pay. Here's a table, with women's names in italics:

| Business Manager | Starting Year | Starting Salary | 2007 or Final Salary |
|---|---|---|---|
| Thomas Connelly | 1998 | $91,000.08 | $122,004.00 |
| Thomas Robaczewski | 2000 | $95,000.00 | $101,921.00 |
| Tim Wilson | 2004 | $85,000.01 | $99,500.11 |
| Helmut Fritz | 2001 | $94,999.99 | $97,635.55 |
| Edgar Perez | 2006 | $93,000.00 | $93,000.00 |
| Mario Saracco | 1998 | $69,448.56 | $81,502.73 |
| Steven Blanchard | 2002 | $77,182.51 | $79,881.10 |
| Dennis Muhr | 1998 | $72,799.92 | $79,598.69 |
| Matthew Marron | 1998 | $63,000.00 | $72,375.05 |
| *Rosanne Maschek* | 2001 | $38,666.64 | $60,399.62 |
| Brett Lanford | 2007 | $60,000.00 | $60,000.00 |
| Christopher Pfister | 2005 | $40,000.01 | $60,000.00 |
| John Czarnik | 2007 | $55,000.00 | $55,000.00 |
| *Pearl Martinez* | 2005 | $40,000.01 | $52,299.77 |
| *Susan King* | 2001 | $40,000.01 | $46,850.23 |
| *Elizabeth Wood* | 2005 | $45,000.00 | $46,350.00 |
| *Michelle Carroll* | 2007 | $42,500.64 | $42,500.64 |
| *Carrie Mengel* | 2007 | $40,000.42 | $40,000.42 |
| *Mary Anne Sapp* | 2001 | $64,000.01 | $37,752.00 |
| *Nancy Rogers* | 2001 | $38,092.01 | $26,624.00 |

The difference between men and women is striking. All of the men were paid more than all but one of the women—and that one woman achieved her $60,000 salary only after six years on the job, while men exceeded the $60,000 line faster.

"Business manager" was a sales job, and the pay of many salespersons is strongly influenced by customers' purchases. But Acosta does not contend that the difference in business managers' pay can be accounted for by the volume of sales; indeed, it concedes that King was one of its most successful sales executives, on a par with Connelly, who was paid almost three times as much. But if sales don't explain the disparity revealed by the table, what does?

Acosta contends that education and experience account for the men's salaries. All have college degrees; King does not. (The record does not show whether other women do.) Education and experience often increase the pay that employers offer, and Acosta had to match or exceed what other firms would pay in order to hire a capable staff. Neither Title VII nor the Equal Pay Act requires employers to ignore the compensation that workers could receive in other jobs, which in the language of the Equal Pay Act is a "factor other than sex" (29 U.S.C. §206(d)(1)). See *American Nurses' Association v. Illinois*, 783 F.2d 716 (7th Cir. 1986).

The district court made a legal error at this step of the analysis. The court thought it enough for Acosta to articulate education and experience as potentially explanatory variables, without proving that they *actually*

account for the difference; the court wrote that King must show that Acosta's explanation is a pretext for discrimination. That's part of the burden-shifting approach under Title VII, see *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142–43 (2000), but is not the way the Equal Pay Act is written.

An employee's only burden under the Equal Pay Act is to show a difference in pay for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions" (§206(d)(1)). An employer asserting that the difference is the result of a "factor other than sex" must present this contention as an affirmative defense—and the proponent of an affirmative defense has the burdens of both production and persuasion. So the Supreme Court said, about §206(d)(1) in particular, in *Corning Glass Works v. Brennan*, 417 U.S. 188, 204 (1974). See also, e.g., *Warren v. Solo Cup Co.*, 516 F.3d 627, 630 (7th Cir. 2008). A concurring opinion in *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012), observed that the burden-shifting approach may cause more confusion than can be justified by its benefits. Today's case illustrates one form that confusion can take.

King's claim under the Equal Pay Act must be returned to the district court for a trial at which Acosta will need to prove, and not just assert, that education and experience account for these differences. The Title VII claim also must be tried, because King has marshalled evidence that would permit a trier of fact to conclude that Acosta's explanations are smokescreens.

Let us suppose that education and experience (which imply greater pay at other firms, with which Acosta is competing for talent) explain some or even all of the difference in the *starting* salaries reflected in the table. There is no reason why they should explain increases in pay while a person is employed by Acosta. Changes in salary at most firms depend on how well a person performs at work. Education and experience may predict on-the-job performance, but the prediction affects the starting wage, just as scores on the LSAT predict grades in law school and thus affect the probability of admission. Once a person has been admitted to a given law school, however, it is performance on exams, or in writing papers, not the LSAT, that determines grades; and grades plus extracurricular activities, not the LSAT score, affect who is hired by which law firms; after that, performance on the job, not the LSAT or grades in law school, determines who makes partner and how much each lawyer is paid. Similarly, if men arrive at Acosta with higher salaries because of education, but men and women are equally good on the job, women should get more rapid raises after employment and the salaries should tend to converge. Law firms may pay extra to people with better credentials, which they can tout to clients, and perhaps Acosta also did this, but this is compatible with salary convergence during employment.

Look at the difference between the starting salary column in the table and the 2007 or final salary column. Men receive substantially greater increases in pay. Salaries did not converge after business managers

began work; they diverged. King worked at Acosta for six years, and her salary rose by less than $7,000; Tim Wilson's salary, by contrast, rose more than $14,000 in three years. Christopher Pfister was hired at $40,000, the same as King's starting wage; but within two years Pfister was at $60,000, while in six years King never topped $50,000. These numbers can't be explained by education and experience at the time of hire, which should matter less as years pass on the job. Differences in the rate of change might be explained by different on-the-job performance, but as we've already mentioned King was one of Acosta's top producers yet was not rewarded accordingly.

Gary Moe, Acosta's general manager for the midwest region, set the business managers' salaries. He testified by deposition that King's sales were "comparable" to that of men who were paid twice as much. When asked how he set salaries, Moe testified that the process was "subjective"; he could not, or would not, elaborate on the reasons why he set any particular business manager's salary where he did.

Acosta's national management set pay scales that were supposed to constrain the discretion of the regional general managers. In 2007 the pay scale for business managers ran from $51,600 to $88,400 a year, with a target median of $73,700. King and all but one of the other women were paid less than the low end of the scale, and all were paid less than the target median. Five men were paid more than the top end of the scale, and seven received more than the target median. Moe had

no explanation for how men's salaries had become so far out of line, or why women were not paid even the minimum. King has an explanation—sex discrimination—and a reasonable juror could conclude that King is right.

At oral argument, Acosta's lawyer suggested that Moe may have set salaries haphazardly or irrationally. Random decision is a factor other than sex. If Moe had acted randomly, however, then the entries for men and women in the table should be jumbled together. The actual distribution is not random. It is difficult to see how every man could be paid more than all but one woman, and why men received greater raises, if Moe were pulling numbers out of a jar.

The judgment is affirmed with respect to working conditions and reversed with respect to salaries, and the case is remanded for trial.