In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3515

JENNIFER HITCHCOCK,

*Plaintiff-Appellant*,

*v.*

ANGEL CORPS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:11-cv-00276—**Roger B. Cosbey**, *Magistrate Judge*.

ARGUED FEBRUARY 26, 2013—DECIDED JUNE 11, 2013

Before EASTERBROOK, *Chief Judge*, and ROVNER and
WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Plaintiff Jennifer Hitchcock
alleges that Angel Corps, a home care agency, fired
her because she was pregnant, in violation of the Preg-
nancy Discrimination Act. Angel Corps proffered
multiple explanations for why Hitchcock was fired, all
revolving around a bizarre incident involving the death
of a 100-year-old potential client. After both parties

consented to adjudication of the matter before the magistrate, he granted Angel Corps's motion for summary judgment. We find that this was error. Hitchcock submitted evidence that the supervisor who fired her expressed animus towards pregnant women and treated Hitchcock differently after learning she was pregnant, only a few weeks before she was fired. Angel Corps's many explanations for Hitchcock's termination were shifting, inconsistent, facially implausible, or all of the above. Therefore, a reasonable jury could conclude that Angel Corps's explanations were lies, and that Hitchcock was fired because she was pregnant. So we reverse and remand.

## I. BACKGROUND

Since Angel Corps moved for summary judgment, we construe the facts in the light most favorable to Hitchcock to the extent that there is a material dispute. Angel Corps is a non-medical home care agency that performs personal care services for its clients. In October 2008, Hitchcock was hired as a client services supervisor, which generally required her to perform new client admissions and assess the new client's needs to help Angel Corps determine what services ought to be provided.

In late January 2010, Hitchcock learned that she was pregnant. She told a few co-workers in late February or early March, and word got to her immediate supervisor after about a week. During a meeting with the supervisor on March 25 (at which point Hitchcock was

only three months pregnant), the supervisor asked Hitch-cock whether she was "quitting" after she gave birth. Hitchcock said it was too early to say, and that such a big decision could not be made for a few more months. The supervisor said Hitchcock needed to make a decision "as soon as possible" so as to have "continuity of care for our clients," and Hitchcock said she would give a minimum of 30 days' notice.

After this conversation, the supervisor began to significantly increase Hitchcock's workload. She started directing all client problems to Hitchcock even if the client insisted on speaking with the supervisor, a change from past practice. She made Hitchcock complete certain monthly reports for which the supervisor was previously responsible, assemble "new admission packets" that were previously handled by an administrative assistant, and perform certain marketing duties that a separate marketing director was already charged with doing. She also began to meet with Hitchcock on a weekly basis to "scrutinize" her progress for the week, which also had never been done before she learned of Hitchcock's pregnancy. The supervisor levied these increased responsibilities even though she had long been aware that Hitchcock could not work more than 40 hours a week because of child care issues, which meant that Hitchcock had to do more work in a shorter amount of time. As a result, Hitchcock felt it was "nearly impossible" to complete these tasks.

Hitchcock also proffered evidence of her supervisor's attitude towards pregnancy through an affidavit of a

former co-worker. According to the co-worker's affidavit, shortly after the supervisor became aware of her pregnancy in early 2009, the supervisor said that because she already had two children and seemed to have enough "trouble" with them, she needed to "think about how much trouble" she would have with three children regarding her "attendance," and said, "If I were you I would have an abortion." (The co-worker was eventually fired, but for reasons that are irrelevant to this suit.)

The event that Angel Corps claims was the cause for Hitchcock's firing occurred on April 5. That day, Hitchcock went to the home of a new client to do an intake and assessment. She was originally scheduled to visit her on March 31 but she called in sick and had to postpone the visit. The client was 100 years old and living with her son. When Hitchcock went into the home, she first went through the paperwork with the son, during which he expressed his "vehement" refusal to allow any medical agency into his home, said that "all doctors are pill pushers" and that his mother would never be put on any medication or see a doctor because he did not trust them. (Recall that Angel Corps technically does not provide medical services.) The son then said that his mother had been refusing nourishment and fluids the last few days, so Hitchcock recommended that he reach out to a hospice for end-of-life care. The son reiterated his opposition to medical care.

After completing the paperwork, Hitchcock asked to see his mother. The son "reluctantly" led her to the bed-

room, opened the door, and walked to the bedside while Hitchcock was positioned in the doorway. From that vantage point, Hitchcock could only see the mother's backside which was covered with a sheet, and the son stood between Hitchcock and his mother the entire time. The son began pointing to areas of the room to explain where her clothes and other items were stored, which Hitchcock perceived was an attempt to divert her attention from the mother. From the doorway, Hitchcock tried to look for signs of breathing or the client's own volitional movement and saw none. Hitchcock also saw brown stains on the pillow case and asked the son if that was blood, but the son said it was simply the Ensure that he tried to give her that morning, which he said she spat out. At that moment, the son stepped towards Hitchcock, turned off the light, and shut the door, backing Hitchcock into the hallway. Hitchcock felt like she had just stepped "into a horror movie" and feared for her safety. Contributing to her fear was the son's apparent hostility to medical care and also what Hitchcock perceived was mental instability. She quickly thanked the son, said that a caregiver would be sent the next day, and left.

Shaken and distraught, Hitchcock drove straight to the Angel Corps office, a 10-to-15 minute drive, and went directly to her supervisor. Hitchcock relayed everything to her, including the son's odd behavior (there is vigorous dispute about whether the evidence shows that Hitchcock specifically told the supervisor that she feared for her safety, but this fact turns out to be unnecessary to our analysis). The supervisor asked

Hitchcock if she should call emergency personnel, and Hitchcock said yes, because the client "was possibly dying, or already dead." The supervisor contacted Adult Protective Services ("APS") and left a message. APS called her back 30 minutes later and directed the supervisor to call 911, and the supervisor called the police. An ambulance was sent, and it was confirmed that the client had died. The supervisor then told Hitchcock to enter the client's admission into the computer; according to Hitchcock, though admission paperwork may be completed early on, the admission *itself* is not "complete" until it is entered into the computer. On April 16, Angel Corps suspended all of Hitchcock's client visits pending its investigation into the incident, which eventually revealed, among other things, that the client had been dead for two or three days by the time Hitchcock visited her. On May 3, Hitchcock was fired.

In the Disciplinary Action Form that was completed and signed by Hitchcock's supervisor the day she was fired, the supervisor wrote, under "Reason For Disciplinary Action," "On 4/5/10 this employee completed a full admission on an expired client." Under "Corrective Steps Taken," she wrote, "Angel Corps and its management staff feel that as a result of this employee's actions she compromised the health and safety of this client. According to policy and procedure this action will result in an immediate termination." In the supervisor's affidavit in this case, she tried to explain this language as follows:

> Had [the client] been living at the time Hitchcock
> did her assessment (such as when Hitchcock was

> originally scheduled to assess [the client on March 31])
> Hitchcock would have compromised the health
> and safety of [the client] by not conducting a proper
> assessment and by not attending to or taking steps
> for Angel Corps [to] attend to obvious problems of
> [the client], such as the dried liquid on her mouth.

An affidavit from a co-owner of Angel Corps explained that Hitchcock was fired because she "performed a deficient assessment on a potential client who had already passed away, and there was no justification or extenuating circumstances for her actions." It did not explain how the assessment was "deficient."

Hitchcock sued Angel Corps for firing her on the basis of her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e(k), *et seq*. The parties consented to adjudication by a magistrate judge pursuant to 28 U.S.C. § 636(c). Angel Corps moved for summary judgment, which the magistrate judge granted. We now consider Hitchcock's appeal.

## II. ANALYSIS

Summary judgment is proper if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review a ruling granting summary judgment *de novo*. *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012).

The Pregnancy Discrimination Act amended Title VII to prohibit employment discrimination "because of or on

the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). "Generally speaking, there are two ways of proving such a claim: the 'direct' method of proof and the 'indirect' method of proof." *Collins v. Amer. Red Cross*, ___ F.3d __, No. 11-3345, 2013 WL 856512, at *3 (7th Cir. Mar. 8, 2013). "Under the direct method, a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motivation. And under the indirect method, a plaintiff must satisfy the well-worn requirements of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* (citations omitted). Having recited the above standards, we hasten to join in the growing chorus of opinions in this circuit, signed onto by a majority of active judges, that have expressed frustration with the confusing "snarls and knots" of this ossified direct/indirect paradigm, and that have suggested a more straightforward analysis of whether a reasonable jury could infer prohibited discrimination. *See Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("By now, . . . the various tests that we insist lawyers use have lost their utility. . . . In order to defeat summary judgment, the plaintiff one way or the other must present evidence that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason. Put differently, it seems to me that the time has come to collapse all these tests into one."); *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 514 (7th

Cir. 2012) (citing *Coleman* concurrence with approval); *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 680 (7th Cir. 2012) ("the direct and indirect methods for proving and analyzing employment discrimination cases . . . have become too complex, too rigid, and too far removed from the statutory question of discriminatory causation"); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 313-14 (7th Cir. 2012) (discussing *Coleman* concurrence and applying a more streamlined, collapsed version of the direct/indirect tests); *see also King v. Acosta Sales and Marketing, Inc.*, 678 F.3d 470, 474 (7th Cir. 2012) ("the burden-shifting approach may cause more confusion than can be justified by its benefits").

Hitchcock formally disclaims reliance on the "indirect" method of proof so technically we are to confine our analysis to whether Hitchcock has proffered sufficient evidence of a discriminatory motivation under the "direct" method. But whether we officially apply the "direct" method or a more straightforward analysis of discriminatory causation (there is little discernible difference in this case), we find that a genuine issue of material fact exists for trial.

### A. There is Sufficient Evidence that Angel Corps's Proffered Explanations for Firing Hitchcock Were Pretextual

In this case it makes sense to first analyze whether there is evidence that Angel Corps's proffered non-discriminatory reasons for firing Hitchcock were pretextual, that is, phony. *See Millbrook v. IBP, Inc.*, 280 F.3d

1169, 1175 (7th Cir. 2002) ("Pretext means a lie, specifically a phony reason for some action." (internal quotation marks omitted)); *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008) (pretext can be evidence of discrimination under direct method). After all, if there is no evidence of pretext, then Angel Corps's non-discriminatory justifications for firing Hitchcock must be believed, which necessarily precludes liability under Title VII. *Cf. Scruggs v. Garts Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) ("The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action.").

We count at least four potentially different explanations given for Hitchcock's firing. Two explanations were given on May 3, 2010, when Hitchcock was fired: that Hitchcock "completed a full admission on an expired client" and that Hitchcock's "actions compromised the health and safety of this client." The supervisor's affidavit proffers another: that Hitchcock *would have* compromised the health and safety of the client had she been alive by failing to deal with the "dried liquid on her mouth" and by failing to take other unspecified steps. The affidavit from one of Angel Corps's owners proffers yet another: that Hitchcock "performed a deficient assessment on a potential client who had already passed away."

We find these shifting explanations to be sufficiently inconsistent or otherwise suspect to create a reasonable inference that they do not reflect the real reason for

Hitchcock's firing. *See Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 726 (7th Cir. 2005) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."). A rational juror could find the supervisor's explanation that Hitchcock "would have" compromised the health and safety of the client to be suspect because it never specifies what Hitchcock did wrong (and neither does the respondent brief's post-hoc, vague explanation that Hitchcock's "failure to do a full admission compromised the health and safety of other potential clients"). But more importantly, it contradicts the plain language on the Disciplinary Action Form which the supervisor herself filled out, that Hitchcock directly "compromised the health and safety of *this* client" (emphasis added). Perhaps the supervisor's affidavit was merely trying to clarify the language on the Form, since it is impossible to "compromise the health and safety" of someone who is already dead (and the supervisor well knew by May 3 that the client was already dead at the time Hitchcock visited). But a reasonable juror could also find the explanation on the official Form itself to be so ludicrous that Angel Corps is not to be believed. *See, e.g.*, *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("The Civil Rights Act of 1964 does not require employers to have 'just cause' for sacking a worker, but an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination." (citation omitted)); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999) (employee's firing for "theft" because he

took a few potato chips from a co-worker's open bag in the break room where the co-worker did not object to the taking, defied "any common understanding of the term" and so lacked credibility). Whether the Form's language is simply a product of bureaucratic imprecision, or whether the subsequent affidavit is instead a post-hoc attempt to cover tracks, we leave to the jury to decide.

As for the Form's explanation that Hitchcock was fired because she "completed a full admission on an expired client," that explanation is undermined by Hitchcock's testimony that the supervisor herself told Hitchcock to enter the admission into the computer (which "completes" it according to Hitchcock, and we defer on summary judgment to Hitchcock's characterization of what "completes" means in Angel Corps parlance) *after* the supervisor knew that the client was dead. *Cf., e.g., Stalter,* 195 F.3d at 290 (employer's explanation that employee was fired for stealing chips could be pretextual when the employer knew that the person from whom the chips were "stolen" was fine with it). Moreover, the Form's explanation concerning the assessment seems inconsistent with the co-owner's criticism of Hitchcock's assessment for being "deficient" (for unexplained reasons).

Angel Corps's brief attempts to make sense out of these disparate explanations, but it does so by piling on additional ever-evolving justifications that may cause a reasonable juror to wonder whether Angel Corps can ever get its story straight. *See Zaccagnini v. Charles Levy Circulating Co.,* 338 F.3d 672, 677 (7th Cir. 2003) (consid-

ering new explanations raised in summary judgment briefs, observing, "the consistency of the explanation provided by an employer at the time of an employment decision . . . is evidence of the veracity of the employer's explanation at summary judgment"). The brief's clearest argument is that Hitchcock was fired for failing to immediately call 911 after leaving the house, which we do not deny would have probably been the best course of action. But the question is whether this explanation actually reflects why Angel Corps fired Hitchcock on May 3, 2010, not whether it provides an adequate post-hoc justification now. *See, e.g.*, *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 693 (7th Cir. 2007) ("[W]e find IUPUI's post hoc explanations, delay, exaggeration, and unusual conduct more than enough to create a question of fact concerning the legitimacy of its explanations for Peirick's termination."). We find that a reasonable juror could believe that this was not Angel Corps's actual motivation. The failure to immediately call 911—an explanation that could have been easily expressed—is not mentioned on the Disciplinary Action Form, and it is not even mentioned in the part of the supervisor's affidavit that attempts to explain why Hitchcock was fired. *See* Norman Aff. ¶ 20; *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 634 (7th Cir. 1996) ("Coca-Cola's failure to express this explanation earlier despite several opportunities to do so" was "compelling" evidence of pretext). Hitchcock's failure to immediately call 911 does not even flunk the test that the supervisor herself set forth elsewhere in her affidavit: "if a Client Services Supervisor observes a

medical issue with a client they are *either* to attempt to address the problem *or to inform me or someone at Angel Corps so that we may provide the client with the appropriate assistance.*" Norman Aff. ¶ 3 (emphasis added). The latter alternative requirement was satisfied when Hitchcock went straight to her supervisor with the issue after leaving the client's home (indeed, the fact that she did exactly what she was supposed to is another reason why a juror could reasonably disbelieve Angel Corps). *See, e.g.*, *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 275 (7th Cir. 1996) (employer's claim that it fired an employee for falsifying records could be pretextual when the company's code could not reasonably be read to support an interpretation that the employee had actually falsified records). Furthermore, even after Hitchcock told the supervisor that the client was "possibly dying, or already dead," the supervisor herself did not call 911 immediately but instead called APS, left a voicemail, then waited for another 30 minutes before APS explicitly instructed the supervisor to reach out to emergency services. Whether the supervisor actually cared about Hitchcock's failure to call 911 immediately is therefore an open question.

The brief also explains that Hitchcock "completed an assessment that was so deficient it did not reveal that [the client] had been dead for days," but again, nothing in the record suggests this was the reason Hitchcock was fired. To be fair, perhaps that is what the co-owner meant when he said vaguely that Hitchcock "performed a deficient assessment on a potential client who had already passed away" (where he failed to

explain exactly how it was "deficient"). We leave to the jury to resolve this ambiguity by deciding whether that was what he meant, or whether he was just providing a conclusory explanation devoid of meaning to distract from some other reason for firing her. *See, e.g.*, *Emmel*, 95 F.3d at 635 (although a generic lawyerly explanation for the plaintiff's firing "may have seemed clever at the time, a jury could see it as an attempt to stonewall").

Both the magistrate judge and Angel Corps suggest that the above is a "mere quibble over language," and emphasize that all of the above explanations at least share a single consistency: the April 5 incident. It may very well be that the April 5 incident was an embarrassment to Angel Corps, and that Hitchcock's mere involvement in that incident was enough to get her fired, even if Angel Corps could not put its finger on precisely what Hitchcock did wrong that day. And if that were the true reason for Hitchcock's firing, however unfair, foolish, or arbitrary that may seem, it would not be a Title VII violation, and a reasonable jury may well arrive at that conclusion. *See Coleman*, 667 F.3d at 852 (we do not ask in Title VII cases whether the reason for firing was "inaccurate or unfair," or whether the employer was "wrong about its employee's performance, or may be too hard on its employee"); *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010) (no Title VII violation if explanation was a mere "error, oddity, or oversight"). But a reasonable jury might also conclude that Angel Corps did not "honestly believe[] the reasons it has offered to explain the discharge." *Coleman*, 667 F.3d at 852. Hitchcock has therefore proffered sufficient evidence of pretext.

**B. A Reasonable Jury Could Conclude that Angel Corps's Real Reason for Firing Hitchcock Was Her Pregnancy**

Of course, a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus. *See Van Antwerp*, 627 F.3d at 298; *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 469 (7th Cir. 2005) ("The plaintiff then bears the burden to show that the stated reason is a pretext for a decision really made on prohibited criteria."). Here we find sufficient evidence to support this showing. If Hitchcock's evidence is to be believed, which it must be at this stage, the supervisor asked Hitchcock if she was "quitting" (not whether she intended to take maternity leave) based solely on her pregnancy, and explicitly recommended to the co-worker that the co-worker get an abortion because her pregnancy would lead to "attendance" problems. *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008) ("'behavior toward or comments directed at other employees in the protected group' is one type of circumstantial evidence that can support an inference of discrimination" (citation omitted)). Animus towards pregnant women may be inferred based on these comments; specifically, a belief that pregnancy disqualifies women from effectively participating in the workforce. Angel Corps argues that "[t]he fact that [the supervisor] asked Hitchcock if she intended to return to work after her pregnancy demonstrates that Angel Corps intended to retain her, all things being equal." (The magistrate judge provided a similarly benign gloss on the supervisor's statement,

noting that the supervisor "asked [Hitchcock] whether she was going to continue her employment at Angel Corps after she gave birth.") But according to Hitchcock's affidavit, her supervisor asked her if she was "quitting." The difference may be subtle, but it is significant in terms of reflecting animus, and we do not construe the record in favor of the party moving for summary judgment. *See, e.g.*, *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044-45 (7th Cir. 1999) (comments including, "If you have another baby, I'll invite you to stay home," and "Gina, you're not coming back after this baby," could have been interpreted by a reasonable jury as animus, even if they could also be interpreted as an innocent joke).

Angel Corps asserts that we have "repeatedly held" that these types of statements "do not constitute evidence of pregnancy discrimination," citing *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151 (7th Cir. 1997). But *Ilhardt* only said that "statements expressing doubt that a woman will return to work full-time after having a baby do not constitute *direct* evidence of pregnancy discrimination." *Id.* at 1156 (emphasis added); *see also id.* (referring to "direct" and "circumstantial" evidence separately). Here, the supervisor's potentially offensive statements are at least *circumstantial* evidence of pregnancy discrimination, because they can be a manifestation of precisely the kind of prejudiced belief that the Pregnancy Discrimination Act was designed to combat—the stereotype that women, particularly mothers, belong in the home. *See Cal. Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 286 n. 19 (1986); *Sheehan*, 173 F.3d at 1045 ("Discrimination on the basis of pregnancy is part of discrimina-

tion against women, and one of the stereotypes involved is that women are less desirable employees because they are liable to become pregnant. This was one of Congress' concerns in passing the Pregnancy Discrimination Act."); *cf., e.g.*, *Hackett v. Clifton Gunderson, L.L.C.*, No. 03 C 6046, 2004 WL 2445373, at *4 (N.D. Ill. Nov. 1, 2004) ("Though statements voicing doubt that an employee will return to work after having a baby do not constitute direct evidence of pregnancy discrimination, these same statements may suffice under the *McDonnell Douglas* framework." (citation omitted)). We think that a reasonable juror could interpret the supervisor's comment as reflecting this belief.[1]

Furthermore, the supervisor's immediate change in treatment towards Hitchcock after learning of her pregnancy, especially the substantial increase in Hitchcock's

---

[1] Hitchcock's Statement of Facts emphasizes that, with the exception of the comment on March 25, her supervisor seemed to actively avoid any workplace conversation concerning her pregnancy, in contrast to her co-workers, who all "congratulated me when they heard the news and shared in my joy," "ask[ed] how my pregnancy was going, when my next doctor's appoint[ment] was going to be, and if I had morning sickness yet." To the extent that Hitchcock suggests that failure to display such enthusiasm ought to be construed as animus, we disagree. Many pregnant women reasonably believe that inquiries from co-workers or supervisors into the details or status of their pregnancy are both inappropriate and intrusive, even while others like Hitchcock may enjoy them. So we do not consider relevant the supervisor's unwillingness to engage in such conversations on other days.

workload involving the sudden and anomalous shifting of multiple responsibilities from other employees, also evidences discriminatory animus. *See, e.g., Coleman*, 667 F.3d at 861 (evidence of retaliation where, among other evidence, within a month after the plaintiff filed complaints, the plaintiff received "a new and unpleasant work assignment"). Angel Corps emphasizes the fact that Hitchcock's increased workload still remained within the scope of her official job description, but that misses the point. The point is that Hitchcock was treated significantly *differently*—and in a manner that a reasonable jury could find deviated anomalously from standard practice—*after* the supervisor learned of her pregnancy. We are unaware of any case suggesting that differential treatment on the basis of a prohibited category never suggests animus so long as the treatment is technically permissible under the cold terms of an official job description (especially a job description as vague and limitless as the one in this case, which included doing "[o]ther duties as assigned by [the] Client Services Director"). *Cf. Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011) ("Formal job titles and rank are not dispositive; an employer cannot 'insulate itself from claims of racial discrimination' by making formalistic distinctions between employees." (citation omitted)).

Lastly, the supervisor's offensive comment to Hitchcock and her sudden change in treatment towards her occurred a little over a month before she was fired. And it occurred less than two weeks before the incident which, a reasonable jury could find in light of all the evidence above, provided a convenient hook for the supervisor to concretely express her discriminatory

intent. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) ("[I]solated comments are not probative of discrimination unless they are '*contemporaneous with the discharge* or causally related to the discharge decision-making process.'" (emphasis added, citation omitted)); *cf. Coleman*, 667 F.3d at 860 ("When temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, . . . suspicious timing can sometimes raise an inference of a causal connection." (citation and internal alterations omitted)); *Loudermilk*, 636 F.3d at 315 ("Suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment. Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible.").

In sum, we find that the evidence provides a sufficient basis for a rational jury to conclude that Hitchcock was fired because she was pregnant. Naturally, Angel Corps disputes several of the critical factual assertions made by Hitchcock. We leave it to the jury to decide whom to believe.

### III. CONCLUSION

For the above-stated reasons, we REVERSE the magistrate judge's grant of summary judgment in favor of the defendant and REMAND for proceedings consistent with this opinion.