In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1926

THOMAS HOBGOOD,

*Plaintiff-Appellant,*

*v.*

ILLINOIS GAMING BOARD, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08-C-5516—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED JANUARY 29, 2013—DECIDED JULY 16, 2013

Before BAUER, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Thomas Hobgood contends that his employer, the Illinois Gaming Board, and several of its employees retaliated against him in violation of Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e-3(a), and the First Amendment. Hobgood was the subject of repeated and intensive investigations that resulted in disciplinary proceedings and termination, though another state agency ultimately

ordered that he be reinstated. Hobgood contends he was the target of this treatment because he helped a fellow Board employee and friend, John Gnutek, with his suits against the Gaming Board under Title VII and the Racketeer Influenced and Corrupt Organizations Act, see 18 U.S.C. § 1964(c). The district court granted summary judgment for the defendants. The court concluded that Hobgood did not furnish evidence that his protected activity — helping Gnutek prepare for litigation — caused any material adverse action, including his eventual firing. The court reasoned that the Gaming Board fired Hobgood not because he had assisted Gnutek, but because the "nature" of that assistance consisted of providing confidential information.

We reverse and remand. The record here presents genuine issues of fact concerning the Gaming Board's and its employees' motives for investigating, disciplining, and terminating Hobgood. This case presents a good example of a plaintiff's use of the "convincing mosaic" approach to showing that an employer acted for unlawful reasons. When the plaintiff's evidence is viewed as a whole, a jury could reasonably infer that the Gaming Board investigated and fired him because he assisted Gnutek with his lawsuits against the Board. The question of the defendants' motives will need to be decided by a jury, not by a judge on summary judgment.

I. *Facts for Purposes of Summary Judgment*

We recount the facts in the light reasonably most favorable to Hobgood. See *Hanners v. Trent*, 674 F.3d 683, 691

(7th Cir. 2012). Beginning in 2002, Hobgood worked as a senior special agent for the investigations division of the Illinois Gaming Board, which was part of the Illinois Department of Revenue at all times relevant here. Hobgood's job involved investigating the backgrounds of those applying for gambling licenses. As part of his job, he had access to confidential information. After he had worked at the Gaming Board for a couple of years, Hobgood applied to become an enforcement operations supervisor. Many others, including Gnutek (who worked then for the enforcement division of the Board), also sought the position. From this pool of applicants the Board selected Mark Stevens, a master sergeant with the Illinois State Police, in 2005. Some employees felt that Stevens's selection reflected the Gaming Board's favoritism toward the State Police. Gnutek thought the selection process was unlawful. He sued the Gaming Board the following year, alleging that it denied him the position of enforcement operations supervisor in retaliation for an earlier gender bias suit.

Hobgood helped Gnutek organize and research his lawsuit against the Gaming Board. To help with the retaliation claim, Hobgood gave Gnutek two documents significant to this case. First, he gave Gnutek a "memorandum for record" that Hobgood had prepared after he talked to Luis Tigera, deputy administrator of the enforcement division. The memo reflected their conversation about the process for hiring the enforcement operations supervisor. Second, the interim administrator of the Gaming Board, Jeanette Tamayo, asked Hobgood to deliver a sealed envelope to Gnutek. He did so, but

we must assume for purposes of summary judgment that Hobgood was not aware of the envelope's contents. The envelope held an "officer action request" approving Stevens's promotion to enforcement operations supervisor. The form contained Stevens's social security number.[1]

As Gnutek's lawsuit proceeded, he added a RICO claim alleging widespread corruption in the Gaming Board's hiring decisions. The claim detailed the activities of William Cellini, a prominent businessman, and Larry Trent, the former director of the Illinois State Police. Hobgood assisted Gnutek with the research and drafting of these allegations, as well.

While preparing for depositions in Gnutek's suit, Tigera and Mark Ostrowski reviewed Gnutek's initial disclosures. (Ostrowski was then the administrator of the Gaming Board, its top executive.) The disclosures included both the memorandum that Hobgood prepared describing his conversation with Tigera and Stevens's officer action request. Realizing that Hobgood was assisting Gnutek in his anti-retaliation and anti-corruption claims against the Gaming Board, Ostrowski and Tigera wanted to investigate Hobgood. Because the Tigera memo was formatted like a transcript of a recording, they believed that Hobgood might have re-

---

[1] Some of the people involved in this lawsuit were also involved in *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008), in which Ms. Tamayo alleged that she was the victim of sex discrimination and a First Amendment violation.

corded Tigera without his consent. They asked the Illinois State Police to investigate whether Hobgood had broken any laws.[2] Ostrowski also asked Luke Hartigan, then the chief investigator for the Department of Revenue's internal affairs division, to investigate Hobgood for the same reason.

The State Police told Hartigan to suspend any internal administrative investigation until the conclusion of their criminal investigation. After they finished, the State Police informed the Gaming Board of the results: "The investigation did not uncover any evidence to substantiate the allegations against Hobgood." The State's Attorney's Office also concluded that no evidence supported the illegal-recording charge and told the Gaming Board that it would not prosecute Hobgood.

With the State Police investigation concluded, Hartigan began his internal investigation. At the outset, the

---

[2] The parties do not specify the law they believed Hobgood violated, but they likely had in mind the Illinois eaves-dropping statute, 720 ILCS 5/14-2(a)(1), which requires consent of all participants for recording a conversation, subject to a number of exceptions. In *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 608 (7th Cir. 2012), this court ordered the entry of a preliminary injunction prohibiting enforcement of the law against those "who openly audio record the audible communications of law-enforcement officers . . . when . . . engaged in their official duties in public places. . . ." That exception is not relevant here.

Gaming Board's general counsel, Mike Fries, told Hartigan that the Board "wants discharge to be considered as the first option." The chief of staff of the Department of Revenue observed later that supervisors should not suggest firing an employee before an internal investigation has even started. This recommendation communicated through general counsel Fries was not the only deviation from policy. Internal investigation procedures also required Hartigan to complete a "case initiation form." That form would have served to establish the scope of Hartigan's investigation at its outset. Without completing the requisite form, the only limit on the scope of Hartigan's investigation was the Gaming Board's instruction that he should uncover misconduct that would justify terminating Hobgood.

Hartigan's investigation far exceeded an inquiry into whether Hobgood had illegally recorded his conversation with Tigera. Hartigan seemed to focus his inquiry more broadly on Hobgood's assistance with Gnutek's lawsuit. Hartigan studied Gnutek's complaints against the Gaming Board and the federal indictments of persons named in his complaints. He requested Hobgood's telephone records to determine how frequently he contacted Gnutek. To facilitate the ongoing investigation, the Gaming Board had put Hobgood on administrative leave. With Hobgood out of the way, a supervisor searched his office and supplied several documents to Hartigan. The documents included two gaming license applications, a background investigation file on former State Police Director Trent, and notebooks

containing personal information on businessman Cellini and his relatives. Although these documents had nothing to do with the ostensible purpose of the investigation — the allegations that Hobgood had illegally recorded Tigera — Hartigan included this evidence in his investigation.

Eventually Hartigan interviewed Gnutek, Hobgood, and Tigera about Hobgood's memorandum about his meeting with Tigera. Gnutek stated that Hobgood had provided it to him. He added that Hobgood also gave him the Stevens officer action request. Tigera told Hartigan that he believed the memorandum was a verbatim record of his conversation with Hobgood. Hobgood denied both recording Tigera and transmitting the Stevens form to Gnutek. But Hartigan dismissed Hobgood's denial, responding, "Let's get past the point of whether you did it or not. We know you did it."

Hartigan prepared a report of his investigation. It retold the conflicting accounts of the Tigera memo but then went far beyond the suspicions that Hobgood had illegally recorded Tigera. Consistent with the unbounded investigation he had done, the bulk of Hartigan's memo focused on Hobgood's assistance to Gnutek. The memo referenced and attached the Stevens form. (Recall, though, that we must assume for purposes of summary judgment that Tamayo provided the Stevens form to Hobgood in a sealed envelope and he had not known what it contained.) To highlight other aspects of Hobgood's assistance to Gnutek, the report also discussed the documents retrieved from Hobgood's office

and suggested that he used them to help Gnutek draft his complaints.[3]

Relying on Hartigan's broad investigation and what can fairly be called, for purposes of summary judgment, its predetermined outcome — rather than the far narrower State Police investigation that resulted in no charges — the Department of Revenue decided to charge Hobgood with misconduct. The state's Labor Relations Department drafted the initial charges. The initial draft alleged that Hobgood had improperly kept in his office copies of the federal indictments and his notes about the Cellini family. But two members of the Department of Revenue disputed the validity and adequacy of the proposed charges. Brian Hamer, the director of the Department of Revenue, recommended lesser charges. He warned that the federal indictments were public information and that referring to them in the charges against Hobgood "seems to weaken the case and suggests that management has an ulterior motive." Hamer also noted (quite sensibly, we must assume) that Hobgood could not have committed a breach of confidentiality as the charges alleged, simply by leaving handwritten notes about Cellini in his own locked office.

---

[3] Hartigan's report did not state whether those documents contained non-public information. In this suit, Hobgood insists that any information from his office used in Gnutek's complaints was based on public information. We are not aware of evidence showing the contrary beyond reasonable dispute.

By contrast, Gaming Board administrator Ostrowski advocated an even more expansive set of charges, including a charge for illegally recording Tigera, despite the State Police finding that no evidence supported the charge. Though Labor Relations normally did the drafting of such charges, in Hobgood's case Ostrowski drafted his own charging document. Like Hartigan's report, his proposed draft of charges focused on Hobgood's aid to Gnutek's suits. Ostrowski's draft alleged that the information in Gnutek's complaint came from the file found in Hobgood's office — and thus was facially incorrect. (The information about former State Police Director Trent was publicly available.)

Following these exchanges, Labor Relations concluded that no evidence supported the additional charges that Ostrowski advocated, including the illegal-recording charge. Labor Relations recommended three charges for the Gaming Board to pursue against Hobgood: (1) conduct unbecoming an employee for possessing certain documents found in his office — the Trent file and the two gaming-license applications; (2) failure to care for official documents by giving the Stevens officer action request to Gnutek; and (3) unauthorized use of confidential information by taking notes of personal information of Cellini and his family.

Appearing before the Gaming Board, Hobgood defended himself against the charges. Regarding the first charge concerning the documents found in his office, he admitted that he had reviewed the Trent file but insisted that he never brought it to his office. He argued

that one of the gaming-license applications in his office was related to one of his assignments; another Gaming Board employee had left the other application in his office, and Hobgood kept it because he believed a related assignment would be forthcoming. Concerning the second charge, Hobgood denied outright that he had given the Stevens form to Gnutek. Finally, on the third charge, he furnished a series of emails showing that a supervisor had asked him to look into Cellini, which he said explained the notes in his office about Cellini. Based on these emails, the Labor Relations Department advised the Gaming Board to remove the third charge against Hobgood. The Gaming Board, however, disregarded this instruction and refused to amend the charges against Hobgood in spite of his evidence and the Labor Relations recommendation. Ultimately, the Gaming Board decided to discharge Hobgood.

Hobgood appealed his discharge to the Illinois Civil Service Commission. At a hearing before an administrative law judge, Hobgood repeated his earlier defenses and added that Tamayo had asked him to deliver to Gnutek a sealed envelope that unbeknownst to him contained the Stevens form. After the hearing, the ALJ concluded that the Gaming Board had proven only one part of the first charge — that Hobgood improperly possessed Trent's file — and that Hobgood had adequately explained all the other documents. But because the Gaming Board had failed to produce the Trent file for the hearing, the ALJ was prevented from analyzing how much confidential information the file actually contained. Accordingly, the ALJ decided that discharge

was inappropriate and imposed only a sixty-day suspension. The Commission upheld the ALJ's findings and Hobgood was reinstated.

Hobgood then filed this suit. He asserted that the Gaming Board investigated and prosecuted him to retaliate against him for helping Gnutek in his Title VII and RICO lawsuits. After discovery, the defendants moved for summary judgment on Hobgood's claims, and the district court granted their motion. See *Gnutek v. Illinois Gaming Bd.*, 2011 WL 1231158 (N.D. Ill. March 30, 2011) (with both Gnutek and Hobgood as plaintiffs). The court concluded that Hobgood did not furnish evidence that his protected activity — helping Gnutek prepare for litigation — caused any material adverse action, including his eventual firing. The court reasoned that the Gaming Board fired Hobgood not because he had assisted Gnutek but because the "nature" of that assistance consisted of providing confidential information. As we view the case, a reasonable jury could agree with the district court's assessment of the defendants' motives, but a reasonable jury could also be convinced by the mosaic of evidence that the Gaming Board fired Hobgood because he had engaged in protected activity. Accordingly, we reverse and remand for trial.

## II. *Analysis*

On appeal Hobgood pursues retaliation claims under both Title VII and the First Amendment. There are two recognized "methods" by which Hobgood could have chosen to oppose the Gaming Board's motion for summary judgment.

The first of these, known commonly as the indirect method or the *McDonnell Douglas* test, has three steps. The first step is that the plaintiff must come forward with evidence of a prima facie case, which has four elements as adapted for this case: (1) plaintiff engaged in activity protected by law; (2) he met his employer's legitimate expectations, *i.e.*, he was performing his job satisfactorily; (3) he suffered a materially adverse action; and (4) he was treated less favorably than a similarly situated employee who did not engage in the activity protected by law. See *Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013), quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012); see generally *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employee has evidence on each of these four elements of the prima facie case, the burden shifts to the employer at the second step of the indirect method to articulate (but not necessarily prove) a legally permissible reason for the adverse employment action. If the employer does so, the analysis moves to the third step, in which the employee tries to show that the employer's stated reason is false, and falsity permits a reasonable inference that the real reason was unlawful. See *Vaughn*, 715 F.3d at 1006.

If any one of the elements of the plaintiff's prima facie case is lacking, the plaintiff loses. For that reason, it is natural that in the majority of "indirect method" cases the parties and courts proceed one painstaking step at a time, offering evidence and argument for and against each prong as separate elements to be satisfied or rebutted one at a time. See, *e.g.*, *Coleman v. Donahoe*, 667

F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("If we move on to the indirect method, we engage in an allemande worthy of the 16th century, carefully executing the first four steps of the dance for the prima facie case, shifting over to the partner for the 'articulation' interlude, and then concluding with the examination of evidence of pretext.").

Hobgood lacked evidence that a "similarly situated" individual received more favorable treatment than he did. Without such evidence, he could not satisfy the fourth element of a prima facie case under the indirect method. But Hobgood could and did invoke what is known as the "direct method" to establish his retaliation claims. Using this method, a plaintiff must offer evidence: (1) that he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action. See *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (Title VII retaliation); *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012) (First Amendment retaliation), quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). The first two elements require only brief comment, while the third, the "causation" prong, provides the true substance for this appeal.

The first element for direct proof of both of Hobgood's retaliation claims requires protected activity. The parties agree that Hobgood engaged in activity protected by Title VII by helping Gnutek organize and file his Title VII retaliation suit. See *Speedy v. Rexnord Corp.*, 243 F.3d 397,

404 (7th Cir. 2001), citing *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996). As for the activity protected under the First Amendment, the treatment of this issue by the district court and in the parties' appellate briefs has been terse. The district court recognized that assisting another employee pursue litigation aimed at proving corruption by senior public officials could be protected conduct. See *Salas v. Wisconsin Dep't of Corrs.*, 493 F.3d 913, 925 (7th Cir. 2007) (employee's participation in co-worker's lawsuit alleging widespread discrimination within the workplace was speech addressing a matter of public concern), quoting *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994); *Schad v. Jones*, 415 F.3d 671, 675 (7th Cir. 2005) ("our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance"), quoting *Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004).

The district court found that Hobgood's help for Gnutek was not protected, though, because the named defendants did not know about it at the time the help was provided. The relevant time for knowledge, though, is when the alleged retaliation took place, not the time the protected activity occurred. Hobgood's evidence tends to show that the Gaming Board prompted first the State Police and then Hartigan to investigate Hobgood only when Tigera and Ostrowski reviewed Gnutek's initial disclosures in his lawsuit and realized that Hobgood had helped him. Hartigan's report on his investigation, which was provided to all defendants, contained several references to Hobgood's help for

Gnutek and easily supports the inference that Hobgood's help for Gnutek's lawsuit was a significant motivating factor, and could well have been a but-for cause, in the investigation and ultimate discipline of Hobgood. See generally *Greene v. Doruff*, 660 F.3d 975, 977-80 (7th Cir. 2011) (adopting but-for causation with burden-shifting mechanism as standard for First Amendment retaliation cases). We find in the record ample evidence that Hobgood's help for Gnutek was both protected by the First Amendment (at least absent proof beyond reasonable dispute that he provided confidential information or otherwise acted improperly) and known to the individual defendants. The district court erred on this point.

The second element of the retaliation claims requires an actionable deprivation. Hobgood's November suspension and his later firing readily qualify as "adverse employment actions" for purposes of Title VII. See *Ellis v. CCA of Tennessee, LLC*, 650 F.3d 640, 650 (7th Cir. 2011) (suspension); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) (discharge). The First Amendment requires a deprivation "likely" to deter free speech, a standard considered more lenient than the Title VII counterpart of adverse action. *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012); *Kidwell*, 679 F.3d at 694. Thus, Hobgood's suspension and firing also satisfy the second prong of the First Amendment claim. We turn to the third element of a direct method case and the main event in this appeal — causation.

To survive summary judgment, Hobgood needed evidence from which a reasonable jury could find that

the Gaming Board decided to suspend and fire him because of his assistance to Gnutek. See *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. \_\_\_, \_\_\_, 132 S. Ct. \_\_\_, \_\_\_ (June 24, 2013) (Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action); *Greene*, 660 F.3d at 978-79. Direct *evidence* of causation — too easily confused with the direct *method* under which such evidence would be presented — would require something akin to an admission from the Gaming Board that it took action against Hobgood because of his protected activity. See *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Such admissions of illegal discrimination and retaliation are rare, so it is not surprising that Hobgood has not presented a "smoking gun" confession by the Gaming Board or any other defendant.

There is another evidentiary route to satisfy the direct method, however, and that is the route Hobgood pursues. Hobgood may satisfy the direct method using what this circuit has termed a "'convincing mosaic' of circumstantial evidence," *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), by relying on evidence of "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn." *Coleman*, 667 F.3d at 860 (internal quotation marks and citations omitted) (alterations in original). In other words, Hobgood must present admissible evidence that, when taken as a whole and viewed in a light favorable to

Hobgood's case, could convince a reasonable jury that he was the victim of unlawful retaliation.

A convincing mosaic must include evidence from which an inference of retaliatory intent could be drawn, and our cases often recite the following shorthand for circumstantial evidence, noting that a plaintiff's case could include: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." See *Teruggi v. CIT Group / Capital Finance, Inc.*, 709 F.3d 654, 659-60 (7th Cir. 2013), quoting *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586-87 (7th Cir. 2011).

But these categories of evidence are not exclusive, nor are they a set of prongs of a circumstantial evidence "test." When considering whether a plaintiff has met his burden through a presentation of circumstantial evidence that amounts to a "convincing mosaic," parties and judges too often lose sight of the purpose of these rhetorical tools. The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity. To answer that question, the individual "bits and pieces" presented by the plaintiff must be

put into context and considered as a whole. All reasonable inferences, of course, must be drawn in favor of the non-moving party. Only then can it be seen whether the plaintiff's evidence amounts to a "convincing mosaic" sufficient to withstand a motion for summary judgment or judgment as a matter of law.

Sometimes cases are presented in which a plaintiff does not have a convincing mosaic, but only one "bit" or "piece." These cases are legion. We have often said that suspicious timing, for example, rarely is sufficient in isolation to support a case of illegal discrimination or retaliation. See *Harper*, 687 F.3d at 308; *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008); *Tomanovich*, 457 F.3d at 665. Similarly, ambiguous or isolated comments that stand alone are insufficient. See *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604-05 (7th Cir. 2012) (absent age-related context, ambiguous comment that manager was "out to get" plaintiff could not overcome summary judgment on plaintiff's age discrimination claim); *Dass v. Chicago Bd. of Ed.*, 675 F.3d 1060, 1072 (7th Cir. 2012) (ambiguous comment unrelated to adverse action was insufficient, without more, to defeat summary judgment); *Petts v. Rockledge Furniture LLC*, 534 F.3d. 715, 721-22 (7th Cir. 2008) (stray remark not made by decision-maker and unrelated to employment decision could not raise inference of discrimination). These cases recognize that a reasonable jury could not infer that a plaintiff was a victim of illegal discrimination or retaliation based on one isolated "bit" or "piece." But "together with other facts," evidence that would be insufficient standing alone

can be sufficient to defeat summary judgment if a reasonable jury ultimately could conclude that the plaintiff was the victim of illegal discrimination or retaliation. *Harper*, 687 F.3d at 308, quoting *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008). That's why it's critical to consider the plaintiff's evidence as a whole.

When viewed as a comprehensive whole, Hobgood's evidence easily supports a reasonable inference that he was the victim of a retaliatory witch hunt. He first presents evidence of statements that, although arguably ambiguous, nonetheless could allow a reasonable jury to infer retaliation if placed in their relevant context and given the benefit of favorable inferences. Consider general counsel Fries's admonition to Hartigan, before his investigation had even begun, that the Gaming Board "wants discharge to be considered as the first option." Perhaps it is true, as defendants argue, that Fries's statement standing alone does not create an inference about *why* the Gaming Board wanted Hobgood fired, though this extraordinary departure from policy and custom could, if believed by the jury, support adverse inferences about the defendants' motives.[4]

---

[4] The district court found that Fries's instruction to Hartigan could not be attributed to Ostrowski. *Gnutek*, 2011 WL 1231158, at *10, n. 21. Ostrowski was the administrator of the Gaming Board, and Fries was the Gaming Board's chief counsel. It is possible, of course, that Fries was acting on his own, but we

(continued...)

Fries's statement does not stand alone. When placed in context and viewed in a light most favorable to Hobgood, the statement reasonably suggests that the Gaming Board had a retaliatory motive. Hartigan initiated his investigations only after the Board learned that Hobgood had been assisting Gnutek in his litigation and after Hobgood had already been cleared of wrongdoing by the State Police and the State's Attorney's office. Yet the evidence allows a reasonable inference that the defendants had pre-judged the question and had decided to terminate Hobgood anyway, even if it meant deviating from so basic and sound a standard policy as refraining from pre-judging outcomes in disciplinary investigations. A jury could infer from this departure from policy that the Gaming Board's predetermined outcome was retaliatory: "Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of [unlawful] intent." *Hanners*, 674 F.3d at 694; see also *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005). Perhaps a jury might find, in spite of this evidence, that the Gaming Board had non-retaliatory reasons for wanting to fire Hobgood without knowing for certain what, if anything, he had

---

[4] (...continued)

believe it is also reasonable to infer that the counsel was acting on behalf of his client, Ostrowski, who had been personally involved in demanding the investigations in the first place.

done. But on summary judgment, we must view this evidence in Hobgood's favor.

In addition, when Hartigan interviewed Hobgood during the investigation, Hartigan said, "Let's get past the point of whether you did it or not. We know you did it." This statement could demonstrate to a jury that Hartigan was not "investigating" anything but was attempting to bolster the Gaming Board's predetermined outcome regardless of what Hobgood had to say. When a supervisor has encouraged an employee who has engaged in protected activity to "confess" or risk termination, a jury can infer retaliatory intent. See *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 974 (7th Cir. 2012) (reversing summary judgment for employer and concluding that jury could infer retaliation in part from supervisor's ambiguous statement to employee before his suspension meeting to "just lay down and tell them what they want to hear, [they] can probably save your job" ).

Hobgood also presents evidence that the Gaming Board's stated reasons for its investigation and his termination were pretexts for unlawful retaliation. See *Everett v. Cook County*, 655 F.3d 723, 729 (7th Cir. 2011) (pretext can be evidence of discrimination under direct method); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) ("Pretext means a lie, specifically a phony reason for some action.") (internal quotation marks omitted). The Gaming Board asserts that Hobgood was investigated because Ostrowski and Hartigan sincerely believed that he had illegally recorded his

conversation with Tigera, and he was terminated because Ostrowski, Krozel, and Hamer sincerely believed that he had misused confidential information in violation of department policies. We do not second guess an employer's business decision, but neither do we "abandon good reason and common sense in assessing an employer's actions." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Where an employer's reason for a termination is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation. See *id*. at 899-91 (employer's justification for termination was unworthy of credence where record revealed inconsistent definition and application of employee's supposed infraction); see also *Hitchcock v. Angel Corps, Inc.*, ___ F.3d. ___, ___ 2013 WL 2507243, at *4 (7th Cir. June 11, 2013) (reversing summary judgment; a reasonable jury could find pretext where explanation provided on employer's official termination form was "so ludicrous that [employer] is not to be believed"), citing *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (reversing summary judgment: "The Civil Rights Act of 1964 does not require employers to have 'just cause' for sacking a worker, but an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination.") (citation omitted); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999) (reversing summary judgment; employee's termination for taking a few taco chips from a co-worker's open snack bag in the break room, where the co-worker

did not object to the taking, defied "any common under-
standing of the term" theft and would not be credited).

Here, a reasonable jury would have ample evidence
from which to infer that the defendants did not
sincerely believe that the investigation against Hobgood
and his eventual termination were warranted by his
unprotected activity. The initiation and scope of
Hartigan's investigation were both suspicious and
support an inference that the investigation was not
prompted by the defendants' belief that Hobgood had
illegally recorded Tigera, but was instead prompted by
the defendants' desire to construct a case for
Hobgood's termination after they discovered that he
had been helping Gnutek with his lawsuit. Departmental
policy required that a case initiation form be completed
at the outset of an investigation to limit its parameters.
Hartigan failed to follow this policy. He investigated a
wide range of possible misdeeds having nothing to do
with any supposed unlawful recording of Tigera but
having much to do with Gnutek's lawsuits. Hartigan
obtained copies of Gnutek's complaints, the federal
indictments of persons featured in them, and even
Hobgood's telephone logs. Why do so if his investiga-
tion was not prompted by Hobgood's aid to Gnutek?
Hartigan also examined documents taken from
Hobgood's office after he was put on administrative
leave: license applications, his notebooks about Cellini,
and a background file on Trent. A reasonable jury
could conclude that Hartigan bypassed the constraints
of a case initiation form because the Gaming Board's

attorney had instructed him that Hobgood's termination was the goal. In other words, the Gaming Board was less interested in whether Hobgood had recorded Tigera illegally and was far more interested in seeing that Hobgood was punished for assisting Gnutek. In sum, a jury could infer that the Gaming Board and other defendants wanted to retaliate against Hobgood for his protected activity.

In addition, the breadth of the unsubstantiated charges, both those drafted by Ostrowski as well as those ultimately adopted by the Gaming Board, supports the inference of retaliatory intent. Ostrowski advocated charging Hobgood with recording Tigera even after the outside investigation by the State Police and Hartigan's internal investigations had found no evidence to support the charge. And Ostrowski wanted the Gaming Board to pursue charges that Hobgood shared confidential information on Cellini and Trent with Gnutek, even though he could not identify any confidential information in Gnutek's filings that derived from Hobgood's notes on Cellini or from Trent's file.

Similarly, the Gaming Board initially planned to charge that Hobgood acted wrongfully by possessing copies of federal indictments, even though Department of Revenue Director Hamer explained that the indictments were public information and that reference to them "seems to weaken the case and suggests that management has an ulterior motive." Hamer also had to point out that Hobgood could not have committed a breach of confidentiality, as the charges alleged, simply

by leaving handwritten notes about Cellini in his *locked office*.

Although the final set of charges was narrower, it still included the charge that Hobgood improperly compiled notes on Cellini. The Gaming Board continued to pursue this charge even after Hobgood showed the Gaming Board emails from his boss's supervisor directing him to investigate Cellini's background.[5] Ultimately, the Illinois Civil Service Commission found that the Gaming Board could substantiate only the single offense that Hobgood possessed Trent's file without authorization. And for that charge, the discipline was limited to a suspension because the Gaming Board produced no evidence to substantiate its contention that the Trent file contained confidential information.

The defendants attempt to undercut each of Hobgood's pieces of evidence individually and argue, as the district court concluded, that the undisputed facts show that the Gaming Board was genuinely concerned only that Hobgood's assistance to Gnutek was possibly illegal. But the defendants ignore the cumulative effect of

---

[5] Defendants criticize Hobgood for failing to ask his boss's boss whether the request for information on Cellini was official or not. We see no basis for concluding as a matter of law that the request was improper, let alone so improper that a subordinate like Hobgood should have been disciplined for complying with it. The record does not indicate that the Gaming Board ever pursued with the boss's boss the possibility that the request was unofficial.

Hobgood's "bits and pieces" of evidence. Taken together, his evidence creates a genuine dispute about the sincerity of the Gaming Board's belief — in other words, whether the Gaming Board's stated reasons for taking action against Hobgood were pretexts. No single piece of evidence might amount to a smoking gun (though Fries's message to Hartigan that the Gaming Board wanted termination to be the "first option" even before Hartigan started his investigation comes close), but the convincing mosaic approach allows a plaintiff to establish retaliation "by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction. . . ." *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). Here, Hobgood has offered quite a lot of evidence pointing toward illegal retaliation.

When properly construed in Hobgood's favor, the evidence could support a jury finding that the defendants fixated on firing him, ignored evidence of his innocence, and circumvented investigatory safeguards to pursue a set of baseless charges because he had helped Gnutek sue the Gaming Board. With the evidence of the defendants' true motivation genuinely disputed, summary judgment was inappropriate. See *Burnett v. LFW Inc.*, 472 F.3d 471, 482 (7th Cir. 2006) (reversing grant of summary judgment in retaliation suit where the sincerity of employer's asserted reason for termination, insubordination, was genuinely

disputed); *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1014-15 (7th Cir. 1997) (reversing grant of summary judgment because plaintiff showed a "pattern of criticism and animosity" by supervisors following her protected activities, creating genuine fact dispute about retaliation). In retaliation cases with evidence of the sort in this record, we must "resist the temptation to act as jurors when considering summary judgment motions," *Coleman*, 667 F.3d at 862, and leave any questions involving the "weighing of conflicting indications of motive and intent" for trial, *Kasten*, 703 F.3d at 974 (internal quotation marks and citation omitted). Accordingly, we reverse the district court's decision and remand for trial.

On a final note, the individual defendants also argue that they are entitled to qualified immunity on the First Amendment claim brought under 42 U.S.C. § 1983. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In determining qualified immunity at the summary judgment stage, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Id*. at 232.

In this case, the answer to both of these questions is yes. First, as we have described, the facts make out a

violation of Hobgood's right to be free from retaliation for exercising his First Amendment rights. Second, it was clearly established at the time of the Gaming Board's actions that the First Amendment prohibited investigating and then suspending and terminating a public employee because he had helped another employee pursue a lawsuit aimed at uncovering and proving public corruption. *Salas*, 493 F.3d at 925; *Spiegla v. Hull*, 371 F.3d 928, 936 (7th Cir. 2004); *Zorzi*, 30 F.3d at 896 (public employee was constitutionally protected against retaliation for filing lawsuit involving a matter of public concern). The defendants argue that they are immune because Hobgood did not have a clearly established right to deliver confidential information to Gnutek, but their argument is irrelevant to the issue of qualified immunity. When the issue is framed properly, it is clear that the defendants are not entitled to qualified immunity on Hobgood's First Amendment retaliation claim.

III. *Conclusion*

It remains to be seen whether Hobgood can prove his case at trial. The defendants paint a very different picture of the relevant facts and of Hobgood's character. But the evidence Hobgood presented in opposing summary judgment is sufficient to present genuine issues of material fact on both his Title VII and First Amendment retaliation claims that must be resolved by a jury, not by the court on summary judgment. The judgment of the

district court is REVERSED and the case is REMANDED for trial.