Eric V. HARDEN, Plaintiff–Appellant,

v.

MARION COUNTY SHERIFF'S
DEPARTMENT, Defendant–
Appellee.

No. 14–1713.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 20, 2015.

Decided Aug. 25, 2015.

Jeffrey S. McQuary, Brown, Tompkins, Lory & Mastrian, Indianapolis, IN, for Plaintiff–Appellant.

Amanda J. Dinges, Office of the Corporation Counsel, Anthony W. Overholt, Frost Brown Todd LLC, Indianapolis, IN, for Defendant–Appellee.

Before RIPPLE and ROVNER, Circuit Judges, and KENNELLY, District Judge.*

---

* Of the United States District Court for the Northern District of Illinois, sitting by desig-

KENNELLY, District Judge.

In 2012, Eric Harden sued the Marion County Sheriff's Department for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e* Of the United States District Court for the Northern District of Illinois, sitting by designation. 3(a). He alleged that the Sheriff's Department terminated him in retaliation for testifying on behalf of African–American police officers in a race discrimination investigation. The district granted summary judgment for the Sheriff's Department. Harden now appeals that decision. We affirm.

### I.

Because we are reviewing the district court's grant of summary judgment against Harden, we recount the facts in the light most favorable to him, "resolving all evidentiary conflicts in [his] favor and according [him] the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe,* 667 F.3d 835, 842 (7th Cir.2012).

Harden was employed by the Marion County Sheriff's Department from November 1, 2008 until his termination on December 23, 2010. He was hired to work as a building deputy and, in that capacity, provided security to the City–County building in Indianapolis. At least two of Harden's supervisors felt that he was an excellent employee. One of his supervisors, Sgt. Ernest Worthington Todd, III, described Harden's "skills, training, and judgment" as "superior to nearly all the other building deputies," and his "demeanor and professional bearing" as "top notch." App. at 54. Another supervisor, Lt. Nathaniel Neal, said that he was "com-

nation.

pletely satisfied with Harden's job performance" and that Harden "was one of my top employees." App. at 49.

In 2010, the Sheriff's Department's Equal Employment Opportunity officer, Sgt. Nancy Blair, initiated an investigation into the alleged discriminatory treatment of African–American deputies. Her investigation focused on two officers in particular: Lt. Tammy Nelson and Cpl. James Russo. Harden, who is Caucasian and thus was not subjected to the alleged discrimination, agreed to be interviewed for the investigation. During his interview, Harden testified that Lt. Nelson and Cpl. Russo treated African–American deputies differently from Caucasian deputies. He alleged that he had "heard comments" that "just [don't] seem right," and that "certain officers are not respected at all." Supp. App. at 1; see also App. at 21. He also alleged that Lt. Nelson and Cpl. Russo gave African–American deputies less-desirable assignments than Caucasian deputies. As a result of this investigation, both Lt. Nelson and Cpl. Russo were demoted.

Shortly after giving this interview, Harden began to notice changes in his work schedule. Harden's patrol time was reduced—a change that, he alleges, was recognized as undesirable in the Sheriff's Department. Harden was also taken off a prestigious assignment with the mayor. When Harden approached Cpl. Russo about the changes, Cpl. Russo replied, "It's not me and Tammy [Nelson] fucking with you, it's [Deputy Chief Shirley] Challis and [Lt. Bryce] Wolfe [sic] fucking with you." App. at 18. He also warned Harden, "[I]n the future you ought to be more careful with who you talk to." App. at 18.

In addition to the work-schedule changes, Harden contends, Lt. Nelson, Cpl. Russo, Lt. Wolf, and Deputy Chief Challis pressured Harden's supervisors to cite Harden for disciplinary infractions.

According to Lt. Neal, Lt. Nelson instructed him to "write [Harden] up for anything I could find on him." App. at 50. Similarly, Lt. Neal also says that Cpl. Russo asked him "why [he] didn't write Harden up more often." App. at 50. (Lt. Neal told him, "it was because [Harden] never did anything wrong." App. at 50.) According to Lt. Neal, Lt. Wolf insisted that a complaint about Harden's conduct on the shooting range "go up the chain of command" even though the shooting range instructor "did not wish to complain on Harden." App. at 50–51. Lt. Neal also "did not agree with the decision to proceed with [the] complaint and, as his supervisor, did not believe that Harden should have been disciplined" for his conduct on the shooting range. App. at 51. In addition, Deputy Chief Challis allegedly instructed another of Harden's supervisors, Sgt. Minton, to find "any reason" he could to discipline Harden. App. at 20.

Harden eventually concluded that he was suffering retaliation and contacted the EEOC. After some initial investigation into his complaint, the EEOC retained an outside investigator, Michelle Cooper, to whom Harden gave a statement in September 2010. Harden testified that after he gave this statement, the harassment ceased.

About three months later, Harden arrested a man by the name of Victor Rybolt for neglect of a child. Upon his release from custody, Rybolt realized that $100 was missing from his wallet and reported the missing property to the Sheriff's Department. One witness to this exchange says that Rybolt initially accused Lt. Maurice Frazier of the theft, though Rybolt himself later denied making this accusation. The following day, the Sheriff's Department launched a criminal investigation regarding the theft. When interviewed by an investigator, Rybolt stated that he had

seen Harden take an unsealed property bag into a back room, where Harden would have been alone. Harden was ultimately cleared by the criminal investigation. The Sheriff's Department then initiated an Internal Affairs investigation. Internal affairs investigators concluded that Harden had, in fact, perpetrated the theft of Rybolt's money. Shortly thereafter, the Sheriff's Department terminated Harden.

Harden filed this suit in May 2012. The district court granted summary judgment in favor of the Sheriff's Department about two years later. This appeal followed.

## II.

■ On appeal, Harden argues that he has presented sufficient evidence of unlawful retaliation to survive summary judgment. He also contends that one of the district court's evidentiary rulings was in error. We review the district court's grant of summary judgment *de novo*, construing all facts and reasonable inferences in the light most favorable to Harden. *See, e.g., Ripberger v. Corizon, Inc.,* 773 F.3d 871, 876 (7th Cir.2014). We review the district court's evidentiary ruling for abuse of discretion. *See, e.g., Harney v. City of Chicago,* 702 F.3d 916, 921 (7th Cir.2012).

### A. Evidentiary issues

We begin with the evidentiary issues raised by the Sheriff's Department. The Sheriff's Department argues that Harden's response to the summary judgment motion relied on inadmissible hearsay. *See Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir.2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). In particular, the Department cited Rybolt's alleged accusation of Lt. Frazier and statements made by various Sheriff's Department personnel to Lt. Neal. The district court ruled

that one of these statements—Rybolt's accusation of Lt. Frazier—was indeed inadmissible hearsay (it did not address the others).

■ This ruling was erroneous. As Harden notes, the statement is offered to prove that the Sheriff's Department was aware of (and ignored) another suspect, not to prove that Lt. Frazier was the thief. Evidence that is "used only to show notice" is not hearsay. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.,* 518 F.3d 459, 468 (7th Cir.2008); *see also* FED. R. EVID. 801(c) advisory committee's note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). The ruling was not reversible error, however, because the district court concluded—as we do—that the Sheriff's Department is entitled to summary judgment even if the statement is considered.

We need not address the other statements cited by the Sheriff's Department, namely statements that Lt. Neal says various supervisory personnel made to him. Even if these statements, which we summarized earlier in this decision, are considered, they do not warrant reversal of the district court's decision.

### B. Retaliation claim

■ Title VII prohibits employers from retaliating against employees for testifying, assisting, or otherwise participating in a race discrimination investigation. 42 U.S.C. § 2000e–3(a). "[R]etaliation may be established by either the direct or indirect methods of proof." *Coleman,* 667 F.3d at 859. Harden proceeds under both methods.

■ To prove retaliation under the direct method, Harden must show that:

(1) he engaged in protected activity, (2) he suffered a materially adverse employment action, and (3) there was a causal link between his protected activity and the adverse action. *Id.* To prove retaliation under the indirect method, Harden must show that: (1) he engaged in protected activity, (2) he suffered a materially adverse employment action, (3) he was meeting his employer's legitimate expectations, and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir.2008). Once the plaintiff establishes a prima facie case under the indirect method, "a presumption of [retaliation] is triggered" and the burden shifts "to the employer to articulate some legitimate, [nonretaliatory] reason for its action." *Coleman*, 667 F.3d at 845 (internal quotation marks omitted). "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.*

 We begin with the direct method. The first two elements are not in dispute.[1] Thus, we limit our inquiry to whether Harden has presented sufficient evidence that his protected activity was a "substantial or motivating factor" in his termination. *Id.* at 860. To do so, Harden may rely on direct evidence, "which would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')." *Id.* (internal quotation marks omitted). He may also "present[ ] a 'convincing mosaic' of circumstantial evidence that would permit the same inference without the employer's admission." *Id.* (internal quotation marks omitted). That is, even if "[n]o single piece of evidence [ ] amount[s] to a smoking gun," Harden may "establish retaliation by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 647 (7th Cir. 2013) (internal quotation marks omitted).

Harden does not have direct evidence of a causal connection and therefore relies on circumstantial evidence to satisfy the third element. We have recognized three categories of circumstantial evidence: suspicious timing, ambiguous statements, and "other bits and pieces from which an inference of [retaliatory] intent might be drawn"; evidence that similarly-situated employees were treated differently; and evidence that the employer's stated reason for the decision was pretext. *Id.* at 643–44. "[T]hese categories of evidence are not exclusive, nor are they a set of prongs of a circumstantial evidence 'test.'" *Id.* at 644.

 Harden first argues that there is evidence of suspicious timing. Temporal proximity between an employee's protected activity and an adverse employment action is rarely enough to show causation. *Coleman*, 667 F.3d at 860. An interval of the length at issue in this case may be

---

1. Although the Sheriff's Department concedes that Harden's termination was a materially adverse action, it argues that the discipline imposed on Harden in the months leading up to his termination was not. That may be true, but it is beside the point. Harden does not say that the discipline was a materially adverse action; rather, he points to the discipline as circumstantial evidence of the Sheriff's Department's true motivations. The rush to discipline him for specious infractions, Harden contends, suggests that the Sheriff's Department was motivated by retaliation.

probative of causation if "there is corroborating evidence of retaliatory motive," *id.* at 861, but Harden has offered no such evidence.

Harden next points to evidence that, he says, reveals "a continuing pattern of harassment of which his termination for theft is the final act." Appellant's Br. at 17. This evidence includes Lt. Nelson and Cpl. Russo's statements encouraging Lt. Neal to discipline Harden; Deputy Chief Challis's statement encouraging Sgt. Minton to discipline Harden; the discipline actually imposed on Harden, which Lt. Neal thought was unwarranted; undesirable changes to Harden's schedule; Cpl. Russo's statement that Deputy Chief Challis and Lt. Wolf were "fucking" with Harden by changing his schedule; Cpl. Russo's warning that Harden "ought to be more careful with who [he] talk[s] to"; and the fact that Harden was removed from his post at the mayor's office, which Lt. Neal interpreted as "retribution for Harden's EEOC complaint." This evidence certainly suggests that officers within the Sheriff's Department—including officers who oversaw Harden's schedule and assignments—had it in for Harden. What's missing, however, is a link between this evidence and Harden's termination. Harden has offered no evidence that the animus of these individual officers had any impact on either the Internal Affairs investigators or the higher-ups who made the decision to terminate him. (Indeed, the harassment ceased after Harden filed a complaint, which suggests that some high-ranking officers opposed this harassment.) Thus, although the evidence of harassment

says something about the context in which the theft investigation was initiated, without more, it cannot support an inference that Harden's termination was retaliatory.

Harden's appeal therefore turns on his claim that the Internal Affairs investigation was mere pretext for unlawful retaliation. Before addressing the merits of Harden's pretext argument, however, we must attend to an issue that was raised at oral argument. Harden's attorney now claims that transcripts of the interviews conducted by Internal Affairs were never produced to him. These transcripts are potentially important because an investigative report that misrepresents witness statements is "enough for a reasonable jury to conclude that the proffered reason for termination is pre-textual." *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 358 (7th Cir.2002), *overruled on other grounds by Hill v. Tangherlini,* 724 F.3d 965 (7th Cir.2013). But Harden neither filed a motion to compel in the district court nor made this argument in any of his briefs.[2] Arguments that are raised for the first time in oral argument are forfeited. *See Veluchamy v. FDIC,* 706 F.3d 810, 817 (7th Cir.2013). Thus, for the purposes of this appeal, we assume that the Sheriff's Department produced transcripts of the Internal Affairs interviews to Harden. Because the transcripts are not in the record, furthermore, we also assume that they are consistent with the Internal Affairs report.

We now turn to whether Harden has offered evidence from which a reasonable jury could find that the Sher-

2. Harden did argue at summary judgment that because the Sheriff's Department failed to produce the audio recordings of the interviews, he was entitled to an inference that these recordings would have supported his case. The district court found, however, that "[s]uch an inference is not warranted in this case because Harden was provided the transcripts of the interviews" and "Harden does not assert that the transcripts themselves are not accurate." *Harden v. Marion Cty. Sheriff's Dep't,* No. 1:12–CV–00581–TWP, 2014 WL 852946, at *6 n. 1 (S.D.Ind. Mar. 4, 2014).

iff's Department's stated reason for the discharge—the conclusion by the Internal Affairs investigators that Harden was responsible for the theft—was a pretext for unlawful retaliation. In making this determination, we do not evaluate whether the stated reason "was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir.2012) (quoting another source). A pretextual decision, then, "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Argyropoulos*, 539 F.3d at 736 (internal quotation marks omitted).

■ Based on the evidence in the record, no reasonable jury could find that the Internal Affairs investigation was unworthy of credence—that is, a "sham" investigation. In a typical sham investigation, persons conducting the investigation fabricate, ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome (for instance, by deliberately failing to interview certain witnesses). The investigation at issue in this case, by contrast, was thorough and transparent. The investigators interviewed each and every person involved in the incident (fourteen in all), they reviewed surveillance footage and radio traffic, and they explained their grounds for eliminating suspects other than Harden. Moreover, there is no evidence of any kind that the investigators themselves harbored retaliatory animus.

In addition to conducting a thorough investigation, the investigators offered a legitimate explanation for their conclusion that Harden was the thief. First, they noted that Harden was the only person who went into the back room, where he would have been alone. Thus, they reasoned, Harden was the only person who had the opportunity to steal the money (because he was the only person who was ever alone with the money) and the means to steal it (because as the arresting officer, he had "legitimate access" to the property bag and "no one would question him handling the property bag or its contents"). App. at 69–70. Second, the investigators observed that Harden's arrest report for Rybolt did not list the amount of money recovered, even though fifty-seven of Harden's fifty-nine other arrest reports listed this amount for those arrestees. This omission, the investigators reasoned, was intended to obscure the fact that a theft had occurred. Third, the investigators noted that when they asked Harden why he did not list the amount, he replied, "You only fill out that part of the incident report if the subject being arrested has over $500.00 on him." App. at 64. That statement, however, was inconsistent with Harden's assertion, made earlier in the interview, that he did not know how much money was in the wallet. It was also inconsistent with his other arrest reports, some of which list denominations as small as $0.25 or $0.00. And fourth, the investigators provided a plausible explanation for why Harden had the motive to commit the theft (disrespectful comments made by Rybolt, which angered Harden, and Harden's personal financial troubles).

■ Harden offers several reasons to support his contention that the investigation was pretextual. First, throughout his brief, Harden disputes the investigators' reasoning. But "faulty reasoning or mistaken judgment on the part of the employer" is not sufficient to show pretext. *Argyropoulos*, 539 F.3d at 736 (internal quotation marks omitted). Rather, Harden must offer evidence tending to show that the Sheriff's Department did not actually believe the findings of the investiga-

tion. To do this by challenging the strength of the Internal Affairs report, Harden "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the report "that a reasonable person could find [it] unworthy of credence." *Harper*, 687 F.3d at 311 (internal quotation marks omitted). He has not done so. At most, Harden has raised some doubts about his guilt. That is not enough to suggest that the Internal Affairs investigation was a sham or that the relevant decisionmakers at the Sheriff's Department did not legitimately rely on the investigators' conclusions in terminating him.

Harden also contends that weaknesses of the criminal investigation cast doubt on the Internal Affairs investigation. First, he points to discrepancies between the criminal investigation interviews and the probable cause affidavit. The criminal investigation, however, was conducted by a different investigator. Moreover, in terminating Harden, the Sheriff's Department relied on the Internal Affairs investigation, not the criminal investigation. The alleged weaknesses of the criminal investigation thus have little bearing on whether the Internal Affairs investigation was a sham or unworthy of credence.

Second, Harden observes that he was cleared by the prosecutor's office and that Detective Sharp—the detective who conducted the criminal investigation—later testified that he did not know who committed the theft. This indicates, Harden contends, that the Sheriff's Department did not really believe that he was guilty. But Detective Sharp was neither involved in the Internal Affairs investigation nor responsible for deciding whether to terminate Harden. Accordingly, his personal beliefs about Harden's guilt tell us nothing about the beliefs of the actual decisionmakers. In any event, the fact that no

criminal charge was instituted against Harden is of little relevance. Criminal investigations and internal investigations are governed by different standards of proof; the Sheriff's Department could honestly believe, based on the Internal Affairs investigation, that Harden committed the theft even if those responsible for instituting criminal charges did not think they could prove a criminal theft charge.

Next, Harden argues that he "immediately became the principal suspect" and that the Sheriff's Department ignored Rybolt's accusation of another officer, Lt. Frazier. The facts in the record, however, do not support this claim. In describing the process by which they conducted the investigation, the investigators state that they "did not focus [their] investigation on Dep. Harden but rather everyone in the room were suspects because they were in the room when the money went missing." App. at 69. Indeed, the investigators interviewed each and every person who was involved in the incident. Harden notes that the Internal Affairs report does not mention Rybolt's accusation of Lt. Frazier. He argues that this omission was deliberate and belies the investigators' true intentions. But there is no evidence in the record that Holland, the person who allegedly heard the accusation, told the investigators about it during her interview.

Lastly, Harden contends that it was highly unusual to investigate an arrestee's theft allegation. Thus, he argues, the fact that the Sheriff's Department initiated the theft investigation in the first place is evidence of pretext. In *Baker v. Macon Resources, Inc.*, 750 F.3d 674 (7th Cir.2014), we said that "selective enforcement or investigation of a disciplinary policy càn [ ] show pretext." *Id.* at 677. *Baker* is distinguishable, however, for two reasons. First, the employer in *Baker* had reason to believe that the plaintiff's supervisors

had violated the same company policy as the plaintiff with regard to the same incident, but failed to "offer[ ] a reason why, at the same time it fired [the plaintiff] . . ., it chose not to investigate whether her own supervisors violated the same reporting rule." *Id.* Our use of the phrase "selective investigation" did not refer to the initiation of the investigation in the first instance, but the manner in which the investigation was conducted once initiated. Here, by contrast, the Internal Affairs investigators did not selectively investigate the theft accusation; they interviewed each and every person involved in the arrest of Rybolt. And although the Sheriff's Department did not typically initiate arrestee theft investigations, there is no evidence in the record that the Department had actually concluded that these other arrestee theft accusations had merit (unlike the Rybolt accusation). Thus, there is no evidence that the Department "selectively enforced" the disciplinary policy either. Second, in addition to selective investigation, the court in *Baker* also found flagrant inaccuracies and inconsistencies in the employer's supposed reason for the terminating the plaintiff. *Id.* In this case, by contrast, there is no evidence that the investigation was conducted in bad faith or that the investigation was not the true basis for Harden's termination.

The same goes for the other cases in which we have said that selective enforcement or investigation can be evidence of pretext. In *Coleman,* we observed that "evidence of selective enforcement of a rule calls into question the veracity of the employer's explanation." *Coleman,* 667 F.3d at 857 (internal quotation marks omitted). But in *Coleman,* unlike the case at bar, it was undisputed that the compa-

rators had actually violated the same rule as the plaintiff (indeed, in a manner that a reasonable jury could conclude was "much more egregious").[3] *Id.* at 857. In *Chaney v. Plainfield Healthcare Center,* 612 F.3d 908 (7th Cir.2010), we concluded that there was evidence that the employer's "grounds for firing [the plaintiff] were insincere" because the decision to terminate was "reached in an unusual way." *Id.* at 916. Specifically, the employer had decided to terminate "within 24 hours of receiving [a] complaint" about the plaintiff, conducted a "cursory investigation," failed to consider "evidence that the complaint was unfounded," and provided "[a] shifting justification for [the] employment action." *Id.* at 915–16. Here, by contrast, the Internal Affairs investigation was thorough and transparent.

For the foregoing reasons, we conclude that no reasonable jury could find that the Internal Affairs investigation was pretextual. The Sheriff's Department was therefore entitled to summary judgment on Harden's claim under the direct method of proof.

■■■ Our conclusion that no reasonable jury could find that the Department's reliance on the Internal Affairs investigation was pretextual is also dispositive of Harden's claim under the indirect method of proof. Where pretext is absent, the court need not "march through" the entire process for showing retaliation under the indirect method. *Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 473 (7th Cir.2002) (proceeding to the dispositive issue of pretext without deciding if the plaintiff had established a prima facie case). The Sheriff's Department is therefore entitled to summary judgment under the indirect method as well.

---

**3.** We also questioned whether the plaintiff could "fairly be said to have violated any

workplace rule at all." *Id.* at 853.

## III.

For the reasons stated above, we AFFIRM the district court's grant of summary judgment in favor of the Sheriff's Department.